**Raymond BROWN, Petitioner,**

v.

**J. D. COX, Superintendent of the Virginia State Penitentiary, Respondent.**

**Linwood Charles EBRON, Petitioner,**

v.

**J. D. COX, Superintendent of the Virginia State Penitentiary, Respondent.**

**Misc. Nos. 6529–N, 6820–N.**

United States District Court, E. D. Virginia, Norfolk Division.

March 6, 1970.

Vann H. Lefcoe, Portsmouth, Va., for Raymond Brown.

William T. Parker, Portsmouth, Va., for Ebron.

Reno S. Harp, III, Asst. Atty. Gen. of Virginia, Richmond, Va., for respondent.

## MEMORANDUM ORDER

WALTER E. HOFFMAN, Chief Judge.

These two habeas corpus cases concern state court prisoners who were involved in the same crimes committed about 12:45 a. m. on Sunday morning, July 27, 1958, in the City of Portsmouth. In all, five juveniles [1] were implicated;

---

1. The ages, according to the presentence reports, were as follows: Raymond Brown, age 17 (d. o. b. July 15, 1941); Linwood Charles Ebron, age 14 (d. o. b.

the others being Major Maryland Davis, Jr., Nelson Jones, and Frederick Williams. The petitioners, Brown and Ebron, were granted separate plenary hearings in the state court, their writs were denied, petitions for writs of error were refused by the Supreme Court of Appeals of Virginia, and they then turned to the federal court for relief.

Because of the age of the petitioners and the confessions given, this court felt that the circumstances surrounding the confessions had not been sufficiently explored in light of Haley v. Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948), Gallegos v. Colorado, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962), Davis v. North Carolina, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966), Reck v. Pate, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961), In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), and many other decisions touching upon confessions of juveniles. Accordingly, plenary hearings were granted by the federal court and the cases were consolidated.

Following a pretrial hearing attended by the petitioners and their counsel [2] on January 22, 1969, an order was entered on February 4, 1969, confining the plenary hearing to the following factual issues:

1. Were petitioners' confessions admissible in evidence?

2. Were petitioners represented by counsel at their respective hearings in the Juvenile and Domestic Relations Court for the City of Portsmouth, or was a guardian ad litem appointed to represent them?

The federal court plenary hearings were conducted on March 26–27, 1969; June 17, 1969; and February 4, 1970.

We entertain no doubts as to the factual guilt of the petitioners. While we do not have a transcript of the trial proceedings of October 8, 1958, at which time these petitioners were tried in the Court of Hustings for the City of Portsmouth on five separate indictments charging rape, two offenses of robbery, and two offenses of maiming,[3] there appears in the state court records presentence reports filed November 12, 1958, which fully disclose the brutality of the crimes committed during the early hours of Sunday, July 27, 1958. We do not, however, under the law, concern ourselves with the factual guilt of the petitioners. The fact that this was gang rape of the female victim, and gang robbery and maiming of both the male and female victims, only serves to support the seriousness of the offenses and gives some substance to the length of the sentences imposed upon these juveniles.

We will initially discuss the proceedings in the Juvenile and Domestic Rela-

---

December 6, 1943); Major Maryland Davis, Jr., age 16; Nelson Jones, age 16; and Frederick Williams, age 16.

2. Petitioner, Ebron, was represented by William T. Parker, Esquire, who also represented Ebron on court appointment in the state court habeas corpus proceeding. After the federal case had been fully heard, briefed, and argued, Mr. Parker died. By this order arrangements are being made for Ebron to sign and file his notice of appeal. Petitioner, Brown, is represented by Vann H. Lefcoe, Esquire. After the case had been fully heard, briefed and argued, the Court was advised that Mr. Lefcoe is about to accept employment elsewhere. Arrangements are being made for Brown to sign and file his notice of appeal.

3. Each petitioner, represented jointly by two competent attorneys, entered a plea of guilty to the rape charge for which they received sentences of 40 years. They entered not guilty pleas to the remaining charges, waived trial by jury, and were convicted in a joint trial, together with Nelson Jones and Frederick Williams. The co-defendant, Major Maryland Davis, was tried a few days earlier. All defendants received the same sentences. Each defendant was sentenced to 10 years on each charge of robbery, and five years on each charge of maiming, with one maiming sentence being made to run concurrently with the robbery sentence. The aggregate sentence, for each defendant was 65 years. The petitioners are eligible for parole on July 26, 1970.

tions Court for the City of Portsmouth. After all five juveniles had been taken into custody, interrogated, and given written confessions on Sunday, July 27, 1958, Detective R. V. Porter obtained and filed juvenile petitions on Monday, July 28, 1958, which was the first day the court was open following the commission of the crimes. In the interim period it is clear that at least the mothers of Nelson Jones, Linwood Charles Ebron, and Raymond Brown had conferred with their sons and one or more of the police officers. On July 30, 1958, the judge of the Juvenile and Domestic Relations Court issued orders of detention in accordance with section 16.1–197 of the Code of Virginia 1950, as amended.[4]

Precisely when attorneys were retained to represent the petitioners is unknown. When Ebron's mother first saw her son on the afternoon of July 27, 1958, she told him not to worry as "we are going to try to get a lawyer and get you out."[5] Two attorneys, J. Hugo Madison and Walter L. Davis ultimately were retained by the parents of Ebron, Brown and Jones. The original juvenile petitions filed against the five boys on July 28 were returnable to August 25, 1958. The Clerk of the Juvenile Court testified that the petitions indicated the cases were continued from August 25, 1958, to September 2, 1958, by agreement of counsel.[5a] It would appear, therefore, that counsel were representing the juveniles prior to August 25,

1958. Mr. Walter L. Davis, one of the attorneys, died on some date between 1958 and 1966. Mr. Madison could not recall whether he was present at the preliminary hearing in the Juvenile and Domestic Relations Court on September 2, 1958, but he states that his 1958 diary reflects the word "Portsmouth" for that particular day without specifying for what purpose Mr. Madison, a Norfolk attorney, would be going to Portsmouth. Mr. Madison further stated that he did not know when he was retained and expressed the view that Mr. Davis was probably first employed. Brown's mother, Christine A. Cherry, testified that it was a couple of weeks before Davis and Madison were retained, and she further estimates this time to be "about the last of August."[6] Mrs. Sullivan, the mother of Ebron, admits having hired Davis and Madison but was not pressed as to the date of employment.

We turn to the testimony of the petitioners on the issue as to whether they were represented by Messrs. Davis and/or Madison at the preliminary hearing on September 2, 1958. Ebron, at the federal hearing, said nobody was there to represent them, and specifically denied the presence of Mr. Davis.[7] Ebron's testimony at his state court hearing on October 11, 1967, was to the contrary as to Davis who, according to Ebron, requested a continuance of the preliminary hearing because Madison was not present.[8] Later, in the same

4. Arrest warrants were issued by a justice of the peace on Sunday morning, July 27, 1958, and were served upon the five juveniles that morning. From the record before us it is difficult to determine whether there was strict compliance with section 16.1–94, et sequi, but this issue, while technically not before the court, is resolved by Durrette v. Commonwealth, 201 Va. 735, 113 S.E.2d 842 (1960). It must be remembered that the first attack upon these convictions did not occur until late 1966, after more than eight years had passed. The recollections of the parties and witnesses must be evaluated with that point in mind.

5. Ebron, p. 37.—Reference to transcripts will be as follows: (1) the joint federal plenary hearing (T. ——); the separate state plenary hearing for Ebron (Ebron, p. ——); the separate state plenary hearing for Brown (Brown, p. ——). The records, transcripts, and exhibits from the state court plenary hearings were incorporated as a part of the federal plenary hearing.

5a. T.195.

6. Brown, pp. 18, 26.

7. T.24, 37.

8. Ebron, p. 38.

plenary hearing,[9] on cross-examination of Ebron the following appears:

"Q. Wait a minute. Did you have counsel there at the preliminary hearing?

A. Sure. A counsel, not two of them which it was supposed to have been.

Q. But you were represented by counsel?

A. Yes. That is what I am telling you now.

Mr. Davis asked Mr. [Judge] Cassell could the case be continued because his partner lawyer wasn't there and they were in this together."

The petitioner, Brown, testified that he was uncertain as to whether Messrs. Davis and/or Madison were present at the juvenile court preliminary hearing,[10] although he knew that his parents had retained the services of these attorneys. Since both Ebron and Brown concede that all five juveniles were present at the hearing on September 2, 1958, at which time Judge Cassell marked the docket sheet "Held for Grand Jury" opposite each name, we think it clear that Mr. Davis, counsel for both Ebron and Brown, was present. We believe it unnecessary to determine whether Mr. Madison was present.

Ebron's mother was admittedly present at the preliminary hearing on September 2, 1958.[11] Brown's mother, Christine A. Cherry, claims to have arrived late for the hearing and that it was over when she arrived. The mother saw Brown's father, from whom she was divorced, coming out of the building as she arrived.[12] The father testified that he was notified of the hearing and that "he got there rather late"—somewhere near the close of the proceeding.[13]

Incidentally, Brown's father "believes" that Davis and Madison were present at the juvenile hearing.[14]

The docket sheet indicates that the following parents were present, all of which appears in the handwriting of Judge Cassell: the mother of Ebron; the father and mother of Brown; the father and mother of Williams; the mother of Davis.[15] It is significant to note that the entries in the handwriting of Judge Cassell correspond with the facts surrounding the presence of petitioners' parents, other than the time of arrival at the hearing. We find that the parents as noted were present during the entire proceedings.

■ The final point with respect to the Juvenile Court proceedings is that the written report required by section 16.1–176(b) was not made prior to the cases being sent on to the grand jury. Concededly, no *written* report was typed until September 11 (Brown) and September 12 (Ebron). Likewise, the statute is mandatory. Tilton v. Commonwealth, 196 Va. 774, 85 S.E.2d 368 (1955). However, neither the statute nor the case law appears to require that the report be in *writing*. The uncontradicted testimony of the Chief Probation Officer is to the effect that, due to clerical shortage and backlog of typing personnel, it was frequently the practice to report orally to the court, with the written report being filed at a later date. This is obviously what happened in these cases. The statute requires an "investigation" to be made—not a "report." It further provides that if the juvenile court makes an "investigation and *report*," with the results being certified to the court of record, the latter court need not order a further investigation. We hold, therefore, that a *written* report was not required as a condition

---

9. Ebron, pp. 52, 53.

10. T.134.

11. T.105, 106; Ebron, p. 65.

12. Brown, p. 23.

13. Brown, pp. 29, 30.

14. Brown, pp. 30, 31.

15. No mention is made of the fifth juvenile, Nelson Jones. Obviously his name appears on another docket sheet as does the fifth charge against "Davis, Major".

precedent to the Juvenile and Domestic Relations Court sending these cases on to the grand jury, and that an oral report was given as a part of the prevailing practice.

■ We hold, furthermore, that there were no constitutional defects in the Juvenile Court proceeding which will afford either of these petitioners any relief.

■ We pass, then, to the more serious question of the confessions. The question is not confined to the strict theory of admissibility. More precisely, the issue is one of voluntariness. Youth by itself is not a ground for holding a confession inadmissible. Williams v. Peyton, 372 F.2d 216 (4 Cir., 1968). We must also consider the length of detention without counsel, any failure to send for the parents, whether the juvenile's will was overborne by sustained pressures upon him, the lack of warnings as to constitutional rights, and the totality of the circumstances.

The sequence of events leading up to the five confessions is, as reconstructed after eight to ten years, as hereinafter stated. At the federal hearing, Ebron claims to have been arrested between 12:30 and 1:00 a. m., at the corner of County and Godwin Streets,[16] but in his state plenary hearing he fixed the time "about 2:00 a. m." [17] and also stated that he was picked up on Glasgow Street.[18] Detective O. S. Butt testified that he was called at his home about 2:40 a. m. and arrived at the Detective Bureau at approximately 3:30 a. m.

Detective Russell V. Porter said that he also received a call around 2:00 a. m.[19] and arrived at approximately the same time as Detective Butt. After a short briefing, the two detectives went to the Portsmouth General Hospital to interview the victims. The male victim was unconscious. The female victim was in such condition that they could not intelligently interview her. The detectives returned to the precinct and, while the times vary, it is likely that this was around 3:45 a. m.

Ebron and Nelson Jones were first taken into custody. It was noted that their pants and shirts were dirty and appeared to have bloodstains thereon. They were taken to the precinct and surrendered their pants and shirts.[20] They were each given a blanket.

Ebron was first brought to the conference room for interrogation by Detectives Butt and Porter. Before interviewing him, Ebron was given a pair of pants and a shirt. The interview was very brief as Ebron professed his innocence. No notes were made of this brief conversation. He was thereupon returned to a cell.

Nelson Jones was next brought to the conference room. According to Jones' confession and the testimony of Butt and Porter, Jones *started* to talk about the crime at 4:00 a. m.[21] Jones, who was apparently deceased at the time of the plenary hearings, was given advice as to his constitutional rights. The detectives likewise testified that Ebron was given the same advice on the two occasions he was interrogated on Sun-

16. T.9.

17. Ebron, p. 42.

18. Ebron, p. 47.

19. Detective Porter fixed this time at midnight when he testified in Ebron's state plenary hearing, but he was testifying without records at the time. T.281; Ebron, p. 111; Brown, p. 58.

20. The following appears in the presentence report prepared after the trial— "An analysis of the samples of physical evidence was made by the office of the Chief Medical Examiner for the State of Virginia in Richmond and some of the clothing of each defendant proved positive for blood of human origin. One piece of clothing of Nelson Jones had sufficient blood to type and it was found to be in Group O, the same as that of the complainant."

21. While one detective stated that the times written on the statements were "exact," we think this to be unlikely as the times on other statements were at 15 minute periods, and we think it more probable that the times stated on the confessions were "approximate."

day morning, July 27. Jones' confession, complete in all essential details, directly implicated Ebron and three other boys.

Much has been made of the fact that Jones' statement mentions that he did not know the "three other boys." In cross-examination of the detectives it is suggested by petitioners' counsel that the officers did not get the names from either Ebron or Jones, despite the fact that the detectives thereafter instructed other officers to pick up Brown, Davis, and Williams. However, it should be noted that Jones makes reference to one of the boys known as "Hardhead and he lives in Brighton." After a period of nine years, it is understandable why the detectives could not account for their knowledge as to the identity of Brown, Williams, and Davis. It certainly would require only a few minutes for an officer to visit the Brighton area to ascertain the identity of a young boy going by the name of "Hardhead." Once that individual had been determined, the names of the others could readily have been obtained. Indeed, with respect to the petitioner, Brown, the evidence discloses that the officers took Williams (or some other boy) to Brown's home for the purpose of showing the officers where Brown lived. This occurred at approximately 7:00 a. m. on Sunday morning, July 27.[21a] We entertain no doubts that Ebron or Jones gave information which enabled the officers to ultimately identify the other three boys.

At 7:30 a. m. on Sunday, July 27, 1958, the interrogation of Major Maryland Davis *commenced*. He identified Jones, Ebron, Williams "and another boy that I only know as Raymond" as participants in the criminal acts.

At 8:30 a. m., the interrogation of Raymond Brown *started*. He was advised of his constitutional rights in substantial accordance with the preamble of his signed statement. Brown identified Ebron, Jones, Williams "and another boy that I didn't know his name." [22] Brown's confession sufficiently implicated him as a principal on the rape charge, and as a principal or accessory to the maiming charges. The statement is silent as to any act of robbery.

After Brown's statement was given, Detective Porter, accompanied by other officers, went to the scene of the crime in company with Frederick Williams. They located certain physical evidence and took soil samples. This trip took approximately one hour.

Detective Butt did not go to the scene of the crime on that morning. The record is not clear as to exactly when the statements were typed or by whom. Detective Porter was of the opinion that Detective Butt probably typed all or most of the statements as Butt typed with greater rapidity. We believe this to be a logical assumption as the form of each statement is substantially identical. However, it should be noted that the body of each statement differs in detail, although the substance reveals essentially the same facts. In all probability Butt typed Jones' statement in the interval between 4:00 a. m. and 7:30 a. m. and, after obtaining his signature, then awaited the next interrogation, with the statements of Davis, Brown and Williams being typed while Detective Porter and other officers visited the scene of the crime.

Ebron was returned to the interrogation room and commenced his second interview with Detectives Butt and Porter around 11:00 a. m. Once again he was advised of his rights. He was advised in general terms as to the contents of the statement given by Nelson Jones.[23] He confessed and shortly there-

21a. T.178; Brown, p. 80.

22. It is significant to note that Brown did not identify Davis, and Davis only knew Brown by his first name.

23. Ebron does not contend that he read Jones' statement. T.17. We think it quite likely that Ebron—and perhaps Davis, Brown and Williams—were told that statements had been made by others

after signed a statement. He testified that he signed five pieces of paper and this may be substantially correct as Detective Butt testified that customarily three or four copies were signed [24] as it was the practice to provide the court with either the original or a signed copy when the statement was presented as evidence.

We must reject the invitation to accept the testimony of the petitioners as to what occurred while they were interrogated. Ebron's evidence is replete with contradictions and inconsistencies. Heretofore considered are his statements as to the time he was taken into custody and his legal representation at the Juvenile Court hearings. These are not innocent errors or a mere inadvertent slip of the tongue. His suggestions of veiled threats, insistence upon calling his mother, the aggressive acts of the unidentified police officer wearing a mustache, and his statement that the typed paper was brought into the room within "one or two minutes" after the interview was ended, do not appear credible. Ebron initially denied that anyone advised him of the charges pending against him until the following Wednesday,[24a] but his prior state court testimony indicates that he was told of these charges when the detectives began to interrogate him.[25] He flatly denies having read the papers he signed. At the federal hearing he fixed the time of signing as being after 11:00 a. m.,[26] with an initial estimate of interrogation time of five hours which he finally reduced to one to three hours,[27] but in his state court hearing he testified that the interrogation began at 6:30 or 7:00 a. m.,[28] and that he signed the five pieces of paper between 7:00 and 8:00 a. m.[29] Despite his attempt to convey the impression at the federal hearing that he had been subjected to a lengthy interrogation for a number of hours, he previously had responded to a question as to how long he had been interrogated before he signed the papers by saying, "They didn't question me too much at all." [30] With due recognition of the obligation of any court to carefully scrutinize the circumstances of any confession given by a juvenile, we can only state that the facts of this case do not support the contentions now advanced by Ebron. We do not suggest that Detectives Butt and Porter recalled all of the details with complete accuracy. Indeed, we would have very little respect for them if they purported to remember every detail. However, we believe that the facts surrounding the giving of the confessions are essentially as related by them. For what it may be worth, it should be noted that Detectives Butt and Porter, at the time they testified in the state and federal plenary hearings, were no longer attached to the Police Department or any other department connected with the City of Portsmouth.

Raymond Brown, age 17 and having completed the first half of the 11th grade in school when arrested, was picked up at his mother's home around 7:00 a. m.,[31] on Sunday, July 27, 1958. The officers took possession of a pair of pants and a shirt lying on a chair.[32] Presumably he

---

which implicated the one being interrogated. A discussion of this police practice is covered elsewhere in the opinion.

24. T.260, 261.

24a. T.51.

25. Ebron, p. 43.

26. T.48.

27. T.74.

28. Ebron, p. 42.

29. Ebron, p. 32; T.76, Ebron, p. 35; Ebron, p. 45.

30. Ebron p. 46.

31. At the federal hearing Brown fixed the time at 5:00 or 6:00 a. m. (T. 110); at the state plenary hearing he gave the time as between 6:00 and 7:00 a. m. (Brown, p. 62); Brown's mother fixed the time about 7:00 a. m. (T. 178) (Brown, p. 14).

32. The seizure of these articles was prior to Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), held not retrospective in Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed. 2d 601 (1965).

arrived at the police station about fifteen minutes thereafter. Brown testified that he remained in a cell "close to an hour," but perhaps only one-half hour.[33] He claims to have been interrogated for one and one-half to two hours,[34] an estimate which appears to be rather excessive in light of the fact that Brown's interrogation was commenced at 8:30 a. m., the interrogation of Davis began at 7:30 a. m., and the Williams interview started at 9:15 a. m. Brown denies having read the statement signed by him and he advances the unique argument that he had assumed that the detectives had only written his exculpatory statements. He did not make this claim at his state court hearing and there is some intimation that his statement was read to him before signing.[35] In the federal hearing he stated that he first knew of the contents of his statement when he received his papers in 1966 perparatory to filing his state court petition.[36]

▆ Brown testified that the detectives showed him Ebron's statement,[37] Williams' statement, and Davis' statement. This is contrary to the testimony of Detectives Porter and Butt, but Porter freely concedes that they probably told both Brown and Ebron the substance of statements given by others already interrogated. Brown also claimed that Major Davis was brought into the room during the interrogation and was asked if Brown was "one of the group that was with him," to which inquiry Davis replied in the affirmative. Detective Porter denies that Davis was brought into the room and Detective Butt did not "believe" that this occurred. Even if we assume that Davis was brought into the room and was asked the question quoted above, we do not believe that such a practice renders any confession involuntary, especially when Brown contends that he had assumed that his statement contained only

exculpatory remarks about where he had been at the time the crimes were committed.

▆ At this point we should perhaps more fully consider police practices in either stating the contents of any statement given by another person, or confronting the accused by another individual who may have confessed or is otherwise implicated, during the interrogation of a suspected criminal with the obvious thought in mind that these acts, or either of them, are likely to result in a confession.

There appears to have been at least three references to this practice by the United States Supreme Court. In Turner v. Pennsylvania, 338 U.S. 62, 69 S.Ct. 1352, 93 L.Ed. 1810 (1949), the interrogating officer *falsely* told the accused that another person had confessed when, in fact, this was not true. While the case does not turn on this issue, it would seem that such a practice is condemned as, in the dissenting opinion of Mr. Justice Clark in Reck v. Pate, 367 U.S. 433, 453, 81 S.Ct. 1541, 1553, 6 L.Ed.2d 948 (1961), in referring to the *Turner* case, he says:

"Such a falsification, in my judgment, presents a much stronger case for relief because at the outset Pennsylvania's officers resorted to trickery. Moreover, such a psychological artifice tends to prey upon the mind, leading its victim to either resort to counter-charges or to assume that 'further resistance [is] useless,' and abandonment of claimed innocence the only course to follow."

In Stein v. New York, 346 U.S. 156, 186, 73 S.Ct. 1077, 97 L.Ed. 1522 (1952), Mr. Justice Jackson, in discussing psychological coercion as applied to the facts of that case, found no misadventure in the manner by which the police con-

---

33. T. 140.

34. T. 128, 145.

35. Brown, p. 72.

36. T. 166.

37. Ebron's statement, according to all evidence, was not taken until after Brown was interrogated.

fronted the co-defendants with what others had admitted, by saying:

"That confession came at a time when he must have known that the police already knew enough, from Jeppeson and Brassett, to make his implication inevitable. Stein held out until after Cooper had confessed and implicated him. Both confessions were 'voluntary,' in the only sense in which confessions to the police by one under arrest and suspicion ever are. The state courts could properly find an absence of psychological coercion."

From the foregoing, it seems clear that mere confrontation of this type does not, standing alone, amount to psychological coercion thereby rendering a subsequent confession involuntary.

Personal confrontation, such as Brown contends was occasioned by Davis being brought into the interrogation room, was considered and tacitly approved in United States v. Hindmarsh, 389 F.2d 137, 140 (6 Cir., 1968), cert. den. 393 U.S. 866, 89 S.Ct. 150, 21 L.Ed.2d 134.

Acknowledging that the contended psychological coercion becomes more critical with juveniles, we do not find from this record that the knowledge of prior confessions by others resulted in "the product of a will overborne". Unlike Ledbetter v. Warden, Maryland Penitentiary, 368 F.2d 490 (4 Cir., 1966), where the police confronted a 19-year-old boy with the confession of another under circumstances where there was incommunicado detention and questioning, refusal of outside contacts, and failure to inform the suspect of even basic rights, the present case stands on detention alone which, as to Brown, was very brief prior to the giving of the confession. The result in *Ledbetter* supported findings by the district court where relief was granted. Moreover, *Ledbetter* was decided exactly 15 days prior to Jacobs v. Warden, Maryland Penitentiary, 367 F.2d 321 (4 Cir., 1966), in which Chief Judge Haynsworth, speaking for the Court, declined to condemn the police practice of confronting one accused of crime with the prior statement of an accomplice, as follows:

"Again, Kelly's confession had all of the hallmarks of trustworthiness. If now it must be held unusable against Kelly because the police, who kept no records to prod their memories after the lapse of time, are now unable to identify their informants and justify Kelly's arrest, there was no unfairness of constitutional proportion in confronting Jacobs with the information Kelly had furnished the police. 'Jacobs does not show that his own confession was involuntary by establishing its responsiveness to word of Kelly's.' "

■ We hold that, absent other circumstances demonstrating physical or manifest psychological coercion, the divulging of the contents of prior statements incriminating the person being interrogated does not render the confession involuntary. Especially is this true where the basic constitutional warnings were given prior to interrogation and there were no requests made to contact the family, an adult, or an attorney.

Brown claims that the entire statement was not written out when he signed the same, and that he saw only one paragraph—which paragraph he did not specify. The incriminatory portion of his statement is contained in one paragraph. The first paragraph is the advice of rights which Brown denies receiving. The last short paragraph is merely a recital that Brown has read the statement, etc. We cannot believe that Brown, after either having read or had told to him the statements of the other co-defendants implicating Brown, would have assumed that the statement presented to him would merely contain a summary of his exculpatory statements relating to his activities.

The suggestion that the detectives indicated to either Ebron or Brown that the signing of a statement would aid them is not only denied by the detectives but is grossly exaggerated. The so-called "Good Guy-Bad Guy" technique is hardly worthy of comment.

The short answer to this overall picture is that once Nelson Jones confessed and implicated Ebron, "Hardhead" and two other boys, the remaining interrogations followed as a matter of course. While it is true that Ebron's mother did not know of his trouble until about 8:00 a. m., and while notification to the parent is an important factor, we do not believe that routine police investigation requires that parents of juveniles be notified that the juvenile child is about to be interrogated as a condition to the voluntariness of a confession where the crime is in the investigatory stage. Nor do we accept the argument that any parent was precluded from seeing the juvenile during the daylight hours on Sunday. Ebron's mother testified at the state plenary hearing that she went to the precinct shortly after 8:00 a. m., and was told by a man—"I don't know who it was" [38]— that she could not see her son. At the federal hearing she identified this individual as Buddy Broughton seated in the desk sergeant's chair, whom she stated that she had known a "good while." [39] It developed that Buddy Broughton was Leel Broughton and, in lieu of his testimony, a stipulation was agreed upon as to what Broughton would testify if called. [40] It appears that Broughton was Assistant Chief of Police in 1958 and he claimed complete ignorance of any knowledge of the case other than having read about it in the newspaper. The key point is that it is highly unlikely that the Assistant Chief of Police would be seated in the place customarily occupied by a desk sergeant at 8:00 or 8:30 a. m. on a Sunday morning. Admittedly it is possible that such occurred, but is highly improbable and, in light of the contradiction in the testimony as related above, we attach no credence to this story.

Attorney Madison stated that neither Ebron nor Brown ever made any complaint to him as to the manner in which the detectives took the statements and, while it is true that in 1958 attorneys were primarily concerned with force, threats and abusive tactics, nothing along this line was suggested. [41] In fact, Brown's words to Madison were noted by Madison, "As far as he knows, he did not sign the statement saying that he had intercourse with the lady." While Mr. Madison does not recall whether he ever saw the statements prior to the trial in the court of record, he did say that he had a general idea as to what was contained therein. It is possible that, if Mr. Madison was not at the Juvenile Court hearing where the statements were presented to Judge Cassell, Mr. Walter L. Davis, the co-counsel, may have examined the statements and conveyed the information to Mr. Madison.

The educational background of Ebron discloses that he had completed grade 8A at Clarke Junior High School. [42] He apparently failed one grade. The records of Clarke Junior High School disclose that he was in grade 8B when he last attended on June 11, 1958. His grades were low or poor. On February 22, 1956, he was given a California Mental Maturity Test which revealed an IQ of 96. An hour silent reading test administered on December 5, 1956, indicated a grade equivalent of 5.5, at a time when he was actually in grade 7B. His social relationships were considered good, with one mark of fair. Responsibility ranged from good to poor, the last mark being poor. Cooperation ranged from very good to poor, the last comment being poor. Work habits ranged from fair to very poor, the last grade being poor. He was classified as "lazy," a "dreamer," "doesn't try," and "tries very hard." Ebron had no prior

38. Ebron, p. 62.

39. T. 99, 105.

40. T. 365, 366.

41. T. 342–350.

42. This was obtained from the Juvenile Probation Officer's report dated September 12, 1958. The Probation Officer for the Court of Hustings reported that Ebron was in grade 8B when he last attended in June 1958. The notes of Attorney Madison also indicate that Ebron was in grade 8B.

criminal record although he was sent home on one occasion for fighting and another time he was suspended from school for the same offense. The foregoing does not reflect essentially low mentality; it more appropriately indicates a young boy who responds slowly, is inherently lazy, and may be characterized as dull-average mentality.

Raymond Brown's prior criminal record is confined to a "peeping Tom" incident on August 30, 1956, in company with Nelson Jones who was similarly charged. The cases were continued until November 26, 1956, at which time the charges were dismissed "with severe warnings to parents and subject." On the educational level, Brown had completed the first half of the eleventh grade at I. C. Norcom High School when he was taken into custody. His scholastic average at Norcom was 73. He was given numerous mentality tests as follows:

| Date | Test | Test Score | Grade Equivalent | Age Equivalent |
|---|---|---|---|---|
| 11/29/54 | Iowa Silent Reading | – | 5.8 | 10.11 |
| 11/29/55 | Iowa Silent Reading (New Ed.) | – | 6.0 | 11.1 |
| 10/26/56 | Quick Scoring I. Q. | 81 | – | – |
| 4/21/58 | California Arithmetic | 8.0 | – | – |

Brown's teachers grade his social relationship as good to fair; responsibility as good to very poor; cooperation as good to fair; self control steady at fair; and work habits good to fair. From an overall standpoint, while Brown is no moron, he apparently ranges between dull and moderately low mentality. Nevertheless, both Brown and Ebron were able, within reasonable bounds, to maintain a grade that was the equivalent of their age.

Considering the many authorities on the subject of juvenile confessions, we note that one dominant theme runs throughout the vast majority of cases where juvenile confessions have been held to be involuntary. That theme is prolonged interrogation—a situation with which we are not confronted in petitioners' cases. Closest in point factually is Gallegos v. Colorado, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962), rehearing den. 370 U.S. 965, 82 S.Ct. 1579, 8 L.Ed. 2d 835 where the court held that on the totality of the circumstances, the formal confession on which the defendant's conviction may have rested was obtained in violation of due process. This case involved a 14-year-old boy who, together with another juvenile, assaulted and robbed an elderly man. Eleven days after the crime Gallegos was picked up by the police and immediately *orally* admitted the assault and robbery. On the following day he again gave an *oral* confession which an officer recorded in longhand. Five days later he signed a "full and formal confession." He was tried on an "assault to injure" charge in the Juvenile Court nine days thereafter, and was committed to an Industrial School for an indeterminate period. Ten days after this trial, the victim died and Gallegos was charged with murder. In a 4 to 3 decision the majority, while recognizing that there was no evidence of prolonged questioning, stresses the fact that, during a five-day detention period, the boy's mother unsuccessfully attempted to see him; the boy was cut off from contact with any lawyer or adult advisor; and, in effect, the court concluded that, without adult protection, a 14-year-old boy would not be able to know, let alone assert, his constitutional

rights. The court continues, however, by saying:

"There is no guide to the decision of cases such as this, except the totality of circumstances that bear on the two factors we have mentioned. The youth of the petitioner, the long detention, the failure to send for his parents, the failure immediately to bring him before the judge of the Juvenile Court, the failure to see to it that he had the advice of a lawyer or a friend—all these combine to make us conclude that the *formal confession* on which this conviction may have rested (See Payne v. Arkansas, 356 U.S. 560, 568, 78 S.Ct. 844, 850, 2 L.Ed.2d 975) was obtained in violation of due process." (Emphasis supplied.)

It is significant to note that the "formal confession" was used at Gallegos' trial, and it was taken and signed six days after the oral admission of guilt. Thus, the fatal defect in *Gallegos* lies in the use of the *formal confession* as the conviction *may have rested* upon this confession. By the majority's failure to condemn the oral confessions, there is at least a strong inference that the two oral confessions were admissible. In the instant cases we have confessions taken immediately after the crimes were committed at a time when the police were conducting their initial investigation.

In *Gallegos*, the door was open for the Supreme Court to strike down the oral confessions given on January 1-2, 1959. This the court did not do. The majority elected to rest their reversal on the ground that the signed confession, obtained 6 days after the first oral confession, may have infected the trial on his plea of not guilty on the charge of murder. Thus, in the jury trial accorded to Gallegos, the jury may well have determined the guilt predicated upon the *formal, signed* confession. An analysis of the factual situation in Gallegos affords only minimal support to the charge of involuntariness of petitioners' signed confessions.

In Haley v. Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948), by a 5 to 4 decision, the Supreme Court held that the methods used in obtaining a confession from a 15-year-old boy were violative of the Due Process Clause of the Fourteenth Amendment. The crimes of robbery and murder were committed on October 14, 1945, with Haley acting as a lookout. About midnight, five days later, Haley was arrested at his home and taken to police headquarters. Disregarding evidence of physical violence, the majority pointed out that, starting shortly after midnight, Haley was interrogated by 5 or 6 police officers in relays of one or two each for a period of five hours. At no time was the boy advised of his right to counsel. Finally, around 5:00 a.m., after being shown alleged confessions of his two accomplices, Haley confessed and signed a statement. For three days thereafter he was held incommunicado and an attorney, retained by his mother, was refused admission to see him. Right after he confessed, a newspaper photographer was permitted to take his picture. His mother was not allowed to see him for over five days after his arrest. As to the events taking place after the confession was given, the majority had this to say:

"It is said that these events are not germane to the present problem because they happened after the confession was made. But they show such a callous attitude of the police towards the safeguards which respect for ordinary standards of human relationships compels that we take with a grain of salt their present apologia that the five-hour grilling of this boy was conducted in a fair and dispassionate manner. When the police are so unmindful of these basic standards of conduct in their public dealings, their secret treatment of a 15-year-old boy behind closed doors in the dead of night becomes darkly suspicious."

Once again, the Supreme Court in *Haley* could have readily disposed of the matter by reason of Haley's age, but this was not done. Mr. Justice Frankfurter, the swing-man in the decision, wrote a separate concurring opinion which clear-

ly indicates that the interrogation of juveniles is permissible, but he based his judgment upon the prolonged interrogation, conducted in relays by many police officers, and the fact that this juvenile had not even been told that anything he said could be held against him. In fact, the dissenting opinion of Mr. Justice Burton, concurred in by Chief Justice Vinson and Justices Reed and Jackson, pointedly states that interrogation of this juvenile, if uncoercive, was proper:

"It is not disputed on Haley's behalf that his arrest and uncoercive questioning after his arrest would have been proper under such circumstances. While the constitutional and statutory rights of the accused, under such circumstances, must be safeguarded carefully, it is equally clear that serious constitutional and statutory obligations rest upon law enforcement officers to discover promptly those guilty of such an unprovoked murder as had been committed. * * * If Haley's part in this crime had been reasonably suspected by the police immediately after its commission at midnight, October 14, the police would have deserved severe criticism if they had not arrested and questioned him that night. The same obligation rested on them, five days later, at midnight, October 19."

We do not believe that the factual issues in *Haley* square with those in the cases involving these petitioners.

Authorities such as Reck v. Pate, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961), involving a 19-year-old "mental defective" shed little light on the solution of the present cases. The facts in *Reck*, as found by the district court and adopted by the Supreme Court, were so flagrant that there could be only one answer to the issue of voluntariness of the confession.

We are not here confronted with prolonged interrogation through sustained pressure, thereby causing the suspect to speak because he is overborne.[43] The circumstances here presented are not the product of the suction process of interrogation. This is not a case in which the detectives falsified any statement of other suspects. These petitioners were told the facts as related by the other boys involved. Even though petitioners were young, and certainly not brilliant students in school, there is no credible suggestion that they were timid or soft. It is perhaps true, as Mr. Justice Jackson said in Stein v. New York, 346 U.S. 156, 186, 73 S.Ct. 1077, 1093, 97 L.Ed. 1522 (1953):

"Of course, these confessions were not voluntary in the sense that petitioners wanted to make them or that they were completely spontaneous, like a confession to a priest, a lawyer, or a psychiatrist. But in this sense no criminal confession is voluntary.

"Cooper's and Stein's confessions obviously came when they were convinced that their dance was over and the time had come to pay the fiddler."

In *Stein*, supra, the court was dealing with hardened criminals and the reference above is only made because we believe that the present petitioners, when told the substance of other statements, fully realized that "the dance was over." This is evidenced by the fact that, in Ebron's case, there was no effort to conduct any lengthy interrogation during the early hours of Sunday, July 27, 1958, and he was returned to a cell until the other four boys had been interviewed and had confessed. Unless we can flatly condemn the practice of truthfully revealing what other persons may have said

43. Protracted interrogation is effectively tantamount to an inquisition. The authorities are too numerous to list but, among others, they are: Watts v. Indiana, 338 U.S. 49, 69 S.Ct. 1347, 93 L.Ed. 1801 (1949); Harris v. South Carolina, 338 U.S. 68, 69 S.Ct. 1354, 93 L.Ed. 1815 (1949); Turner v. Pennsylvania, 338 U.S. 62, 69 S.Ct. 1352, 93 L.Ed. 1810 (1949); Chambers v. Florida, 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716 (1940); and Ashcraft v. Tennessee, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192 (1944).

with respect to the juvenile's participation in the crime, we arrive at the conclusion that youth and less-than-average intelligence constitute the only barriers to the voluntariness of the confessions.

We must bear in mind that many instances in which confessions have been found to be voluntary do not reach the appellate level and, if application for certiorari is filed, the petition is frequently denied without comment. Thus, comparable situations are difficult to find. For example, the facts surrounding the crime in Vanleeward v. Rutledge, 369 F.2d 584 (5 Cir., 1966), were essentially the same, involving a 17-year-old Negro boy who was convicted of rape and given a death sentence. But when we examine the contended voluntariness of the confession, we find the facts strikingly dissimilar. The accused was picked up by the police three days after the crime at about 3:30 p. m. He was initially interrogated by the Chief of Police for 30 minutes. He was then interrogated off and on by detectives and officers, with 4 or 5 officers present at all times, until 11:00 p. m., during which time efforts were made to check his alibis. With one hour recess to eat, the accused then told his interrogators that he had talked with someone who had admitted being involved in the offense and had named four companions. About 1:00 a. m., the officers, accompanied by the accused, rounded up the five boys. They returned to jail at 4:00 a. m., and the accused was placed in a cell. During the evening in question the accused, at the request or demand of the officers, surrendered his undershorts and removed pubic hairs from his body, delivering same to the officers. On the evening of the day the accused was taken into custody, the parents sought permission to see the boy, but were refused although they waited for about five hours. On the day following the arrest, after verifying the whereabouts of the five boys named by the accused and satisfying themselves that they were not involved, the officers placed the accused in several lineups where he was identified by the victim and her male companion. He was again interrogated from 9:00 p. m. to 11:30 p. m., when he began to make his incriminatory statement. At that time—and for the first time—the accused was advised as to his constitutional rights. Acting on the authority of Collins v. Beto, 348 F.2d 823 (5 Cir., 1965),[44] Gallegos v. Colorado, supra, and Davis v. State of North Carolina, supra, the court properly concluded that the statement was involuntary. Once again, we are confronted with prolonged interrogation and refusal to permit parents to see a juvenile prior to the giving of the incriminatory statement.

We have not considered the possible issue as to the legality of custodial questioning on less than probable cause for a full-fledged arrest, as this was neither factually nor legally developed during the plenary hearings; nor was it an issue framed by counsel following an extensive pretrial conference. Since the final argument was conducted, the case of Morales v. State of New York, 396 U.S. 102, 90 S.Ct. 291, 24 L.Ed.2d 299, was decided on December 8, 1969. The Supreme Court did not come to grips with the question. We know nothing from this record as to how and why Ebron and Jones were picked up [45] about 2:00 a. m. on the morning the crimes were committed, except that they had apparent bloodstains on their clothing and were in the general neighborhood. As to Brown, we know that he had been identified through the prior statements given and, as to him, probable cause undoubtedly existed unless the fruit-of-the-poison-tree doctrine is applicable, if probable cause did not exist for the arrest of Ebron and Jones. Probable cause also existed at the time Ebron confessed around 11:00 a. m.

44. Collins v. Beto involved another instance of prolonged interrogation prior to confession, coupled with admittedly illegal police practices during the interim period.

45. Whether legally or illegally "arrested" in the formal sense of the word, for the purpose of this discussion we deem that Ebron and Jones were "arrested" when picked up.

on Sunday morning, but again the "poison tree" doctrine may be applicable. The further question arises that, if probable cause did not exist and the early morning confession of Jones was therefore illegal, whether any retrospective treatment should be accorded to these arrests made in 1958. As the Supreme Court noted in *Morales*, the "stop-and-frisk" cases considered in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1839, 20 L.Ed.2d 917 (1968), are inapplicable as they involve search and seizure issues. In Collins v. Beto, supra, former Chief Judge Tuttle concluded that an arrest without probable cause precluded the use of a confession thereafter obtained,[46] unless the officers had "purged the taint" prior to the time the inculpatory statement was given by affording the suspect an effective opportunity to obtain the assistance of counsel. Circuit Judge Friendly, sitting by designation, while agreeing with the result that a confession obtained after prolonged interrogation was involuntary, elected not to join Judge Tuttle on his views iterated above.

Since more capable jurists have not seen fit to pass upon this important question, and since the issues framed and the record do not encompass this point, we must defer the matter awaiting an authoritative decision. We might add, however, that this question was decided in Jacobs v. Warden, Maryland Penitentiary, 367 F.2d 321, 323, where Chief Judge Haynsworth said:

"An arrest of one of multiple offenders upon improbable cause, or upon cause which years after the event cannot be documented, may invoke rules of exclusion for the protection of the victim of the illegal arrest, but it does not deprive the victim's statement of the inherent and apparent reliability it convincingly undeniably bore then and now."

█ In the landmark case of In re Gault, 387 U.S. 1, 45, 87 S.Ct. 1428, 1453, 18 L.Ed.2d 527 (1967), Mr. Justice Fortas emphasizes that the underlying principle governing the exclusion of a confession is that "it is, under certain conditions, testimonially untrustworthy." Tested by this basic principle, together with the totality of the circumstances here presented, we do not find in fact or in law that the petitioners' confessions were involuntary.

Petitioners' counsel stress Williams v. Peyton, 404 F.2d 528 (4 Cir., 1968), in which the district court voided the state court convictions under *In re Gault*, supra, as the juvenile did not have counsel at the juvenile court hearing in 1945. The appellate court did not elect to decide whether *Gault* was to be applied retrospectively, but ruled the confession inadmissible on his not guilty pleas. The facts as found by the appellate court were that this boy, just under 15 years of age, was held incommunicado for at least 3 days before being taken before a juvenile judge; that he was questioned intermittently during this time and then taken to the homes of three victims; he was then taken to the scenes of the crimes, following which he was placed in the back seat of an automobile, between two officers, and interrogated further without being given any explanation or warning of his constitutional rights. While Williams had maintained his innocence up until this time, he finally confessed. The totality of the circumstances in *Williams* is far more

---

46. Judge Tuttle's conclusion was predicated upon Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), and Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). Wong Sun dealt with a federal conviction in which there had been both an unlawful arrest and an unlawful search. Escobedo cannot be applied in retrospect. Judge Friendly distinguishes between the unlawful arrest and the "fruit" of the unconstitutional act, in light of the intervening "decision to speak" on the part of the suspect.

aggravated than the circumstances confronting the court in petitioners' cases.[47]

Lastly, some mention should be made as to the sentences aggregating 65 years which were imposed by the state court following the entry of pleas of guilty to rape and findings of guilt on the charges of robbery and maiming.[48] That the aggregate sentences imposed are undoubtedly severe when we consider the ages and past records of these petitioners cannot be questioned, even though the crimes were as heinous as they were. However, under Virginia law, even a lifetermer becomes eligible for parole after 12 years. While the sentences imposed, all within the maximum provided by law, should have no bearing upon the decision of this or any other court, the 12-year parole eligibility date is mentioned to demonstrate that these petitioners, assuming good behavior on their part, will not spend substantially the rest of their lives in the Virginia penal system.

For reasons heretofore stated, it is ORDERED that the petitions of Raymond Brown and Linwood Charles Ebron be, and they hereby are, DENIED and DISMISSED.

This is a *final* order. Either petitioner may file a notice of appeal within 30 days from this date by forwarding same to the Clerk of the United States District Court, Post Office Box 1318, Norfolk, Virginia 23501. Because of the situation mentioned with respect to counsel for these petitioners, the Clerk will prepare a notice of appeal in each case, and shall forward same to the petitioners involved, thereby making it necessary *only* for each petitioner to sign and return the same to the Clerk. The petitioners, or either of them, may appeal *in forma pauperis.* Certificates of probable cause are hereby granted. For the information of the petitioners, counsel for petitioners will be appointed by the United States Court of Appeals for the Fourth Circuit, if said court deems such action appropriate.

The Clerk will forward certified copies of this memorandum order to (1) Raymond Brown, (2) Linwood Charles Ebron, (3) Vann H. Lefcoe, Esquire, and (4) Reno S. Harp, III, Esquire, Assistant Attorney General of Virginia. The copies forwarded to each petitioner shall be accompanied by a properly prepared notice of appeal requiring only the signature of the petitioner, and shall be sent by certified or registered mail, return receipt requested.

---

47. Nor are we concerned with Blackburn v. Copinger, Warden, 4 Cir., 421 F.2d 602, decided February 20, 1970. Once again, the totality of the circumstances were such that the confession was involuntary.

48. One maiming charge was reduced to a lesser offense, but this is immaterial to a decision in this case.