**Willie GILBERT**

v.

**Dr. George J. BETO, Director, Texas Department of Corrections.**

**Civ. A. No. 66–H–157.**

United States District Court
S. D. Texas,
Houston Division.
July 31, 1967.

------◆------

Edward R. Baird, Houston, Tex., for petitioner.

Dunklin Sullivan, Asst. Atty. Gen. of Texas, Austin, Tex., for respondent.

## MEMORANDUM AND OPINION

SINGLETON, District Judge.

Petitioner, Willie Gilbert, was convicted of murder with malice in 1953 and was sentenced to 99 years in the State penitentiary. Maurice Sampson, his co-indictee, was convicted and sentenced to death. Both convictions were affirmed on appeal. Sampson v. State, 160 Tex. Cr.R. 302, 268 S.W.2d 661 (1953); Gilbert v. State, 159 Tex.Cr.R. 424, 265 S.W.2d 110 (1953). Sampson was electrocuted in 1954, and now, after serving 14 years of his sentence, Willie Gilbert has petitioned this court to set aside his own conviction on the ground that his confession offered into evidence at trial was unconstitutionally obtained. On agreement of counsel appointed for petitioner and counsel for respondent, the case was submitted on briefs and the transcript made at petitioner's trial.

Before setting forth the facts gathered from petitioner's trial transcript, I feel it appropriate first to set forth the basic principles which control this court's review of the case. Since Brown v. State of Mississippi, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936), it has been established that the admission into evidence of an accused's confession which is not the product of a free choice violates due process. This is true, although there might be independent evidence in the record sufficient to sustain the conviction,[1] for the issue is in essence one of *procedural* due process. In determining whether a confession is admissible, the constitutional test is the voluntariness of the confession rather than its trustworthiness, as might be indicated by its truth or falsity. *E. g.*, Blackburn v. State of Alabama, 361 U.S. 199, 206, 80 S.Ct. 274, 4 L.Ed.2d 242 (1961); Watts v. State of Indiana, 338 U.S. 49, 50, 69 S.Ct. 1347, 93 L.Ed. 1801 (1949); Lisenba v. People of State of California, 314 U.S. 219, 236, 62 S.Ct. 280, 86 L.Ed. 166 (1941). Voluntariness, in turn, is determined by weighing the totality of the circumstances surrounding the making of the confession and evaluating their probable effect on the confessor,

---

1. *E. g.*, Payne v. State of Arkansas, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958); Haley v. State of Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948); Malinski v. People of State of New York, 324 U.S. 401, 65 S.Ct. 781, 89 L.Ed. 1029 (1945). But see Stein v. People of State of New York, 346 U.S. 156, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953). See generally Comment, 32 Texas L.Rev. 429 (1954).

In the instant case, petitioner could not have been indicted without the confession, much less convicted. Besides the confession, the State's evidence consisted of a club found in the house where petitioner's co-indictee stayed. (T. 104, 106). A chemist called by the State at trial testified that there was human blood on the club but that he could not ascertain whether it was of the blood type of the decedent. (T. 111). The pistol with which the decedent was shot was never found. In addition to this evidence, the testimony of one witness placed petitioner within two blocks of the scene of the crime approximately thirty minutes before it was committed. (T. 183, 184).

with his peculiar weaknesses and strengths. Fikes v. State of Alabama, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957); Stein v. People of State of New York, 346 U.S. 156, 73 S.Ct. 1077 (1953); see Crooker v. People of State of California, 357 U.S. 433, 78 S.Ct. 1287, 2 L.Ed. 2d 1448 (1958). Where, as here, the trial occurred before the decision in Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the principles announced there are relevant, but only insofar as they bear on the issue of voluntariness. See Clewis v. State of Texas, 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423 (April 24, 1967); Davis v. State of North Carolina, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966).

Proceeding to an examination of petitioner's transcript, I find the following facts, excerpted for the most part from the testimony of State witnesses, to be substantially undisputed. On January 6, 1953, Mrs. Ruth McCasland was brutally murdered while working in a flower shop located on North Shepherd Boulevard in Houston, Texas. In order to facilitate investigation of the crime, the Harris County Sheriff set up a temporary headquarters in an old cafe near the flower shop, approximately six miles from the downtown Sheriff's office. (T. 73, 84). There, officers of the Sheriff's Department worked around the clock from January 6 to January 12. (T. 94, 324). To this location officers brought some ten to fifteen suspects. (T. 360). Petitioner was among that number.

Petitioner's first contact with the police occurred less than twenty-four hours after the murder was committed, and from that time petitioner was never again outside the absolute control of the Sheriff's Department until he confessed on January 11. At approximately 10:00 A.M. on January 7, petitioner was arrested without warrant or probable cause several blocks from the flower shop. (T. 102). Although the arresting officers testified that he was arrested on suspicion of tire theft, they carried him immediately to the flower shop where he was questioned by Sheriff Kern. (T. 78, 79). Sheriff Kern testified that he questioned petitioner about the tire theft for fifteen or twenty minutes, while petitioner testified that he was questioned about the murder. Sheriff Kern also testified that he did not obtain evidence sufficient to warrant questioning petitioner about the murder until January 8, (T. 81), but it is clear from other testimony that attention focused on petitioner as a suspect on the very day of his arrest.

After leaving the flower shop, Deputy Sheriff Randio, one of the arresting officers, carried petitioner to the county jail, and later that day filed a vagrancy complaint against him. Deputy Randio's undisputed testimony on cross-examination demonstrates that there was no factual support for the complaint and reveals that the true purpose for the filing of the complaint was to allow the Sheriff's Department to hold petitioner for investigation in the murder. Deputy Randio testified in part as follows:

"Q. What was the basis for the filing of that complaint against Willie Gilbert?

"Mr. Scott. If the Court please, the complaint speaks for itself.

"The Court. Not under these circumstances.

"A. He was put in jail for burglary.

"Q. For burglary?

"A. Yes.

"Q. Do you know, Mr. Randio, if any other officers in the Sheriff's Department, are you a member of it? [sic] Had anything to do with the filing of this complaint for vagrancy in the Justice of the Peace Court besides yourself?

"A. I filed the charge.

"Q. Did Sheriff Kern tell you to do this?

"A. *No, not on that vagrancy charge.* (Emphasis Added.)

"Q. Did any other officer or deputy sheriff of Harris County tell you to file vagrancy on him?

"A. No.

"Q. When you filed the complaint you knew what the charge was, didn't you?

"A. Yes, sir, it was a vagrancy charge.

"Q. Did you know whether the boy was working or not, Willie Gilbert, when you filed this complaint?

"A. *No, sir, I didn't know whether he had a job.* (Emphasis Added.)

"Q. Did you know whether he lived with his parents, had a home in Houston?

"A. *I didn't know anything about him.* (Emphasis Added.)

"Q. Did you ask him whether or not he had a job?

"A. No, but I [sic] ask him where he got that radiator he had in the car and he told me it was stolen.

"Q. Why didn't you file a charge on him for theft?

"A. *We were working on a murder,* the man was picked up and taken to jail, we were out there looking for something around the murder area. (Emphasis Added.)

"Q. You didn't mention anything to Judge Ragan [sic] this boy might be a possible suspect in this murder?

"A. I don't know.

"Q. Did you know whether this boy you caused a complaint for vagrancy to be filed against him was employed or not at the Blue Diamond?

"A. No, I didn't know, I didn't talk to him that long.

"Q. Having been told he [sic] stold a radiator which was in his automobile why didn't you file charges of theft against him?

"A. *We were out searching the area for anything in connection with the murder, he was turned over to Sheriff Kern and Chief Frazier, as a matter of fact Chief Frazier was with me when he was arrested.*" (Emphasis Added.) (T. 218–221).

On the vagrancy complaint filed by Deputy Randio appeared the notation "Hold for Homicide Div. $500." Attempts by petitioner's trial counsel to ascertain from Deputy Randio when the notation was made, by whom, and at whose bidding proved fruitless.

"Q. Look what it says on the complaint, have you noticed the notation in ink here at the bottom, what does that say?

"A. That is not mine.

"Q. Read it?

"A. Hold for homicide investigation.

"Q. Did you give Judge Ragan that information?

"A. *I don't remember.* (Emphasis Added.)

"Q. You don't remember, would you say you did or didn't?

"A. *I don't remember.* (Emphasis Added.)

"Q. Did you tell Judge Ragan you wanted them held for an alleged robbery that had been committed?

"A. I don't think the Judge [sic] ask." (T. 218–19).

Judge Ragan did remember, however, for he testified that he personally made the notation and that he did so on January 7, the date the complaint was filed. (T. 215, 217). Thus, despite the testimony of Sheriff's officers that petitioner was not considered a suspect until some unstated date between January 7 and January 11, (T. 93), I am of the opinion that petitioner was considered a suspect on January 7 and was held as such.

Bearing in mind that petitioner was held as a suspect on January 7, although Sheriff Kern's testimony is undisputed that his department had no basis on

which to question petitioner until January 8, careful scrutiny must be given to the treatment subsequently accorded him. Compare Haley v. State of Ohio, 332 U.S. 596, 600, 68 S.Ct. 302, 92 L.Ed. 224 (1948). Since petitioner's detention was unlawful at the outset, it is not surprising to discover that Sheriff's officers failed to take him *immediately* before a magistrate as required by state law.[2] Presentment before a magistrate was delayed until after petitioner confessed on January 11, (T. 79), and he was not informed of his right to remain silent until he was prepared to give a statement. (T. 64–65). At no time was petitioner advised of his right to counsel. *Ibid.* Moreover, from the day of his arrest until the confession was signed, petitioner was denied the counsel and comfort of relatives, friends, or an attorney because it was the rule at county jail that prisoners were not permitted to have visitors except on Saturday. (T. 99). In petitioner's case, this meant total isolation until he confessed.[3]

What happened to petitioner during the five-day period in which he was held incommunicado is, for the most part, either disputed or unclear. As was so often true of cases arising long before Miranda v. State of Arizona, *supra*, the fairness of the treatment accorded petitioner during this critical period turned on the credibility attributed by the jury to the testimony of officers actively involved in the investigation and the testimony of the accused. Petitioner testified that he was beaten repeatedly by the officers and

that he was taken from the county jail to the temporary headquarters at 7:00 each morning and not returned to the jail until 3:00 the next morning. (T. 284, 291). This was denied, and thus for the purposes of this opinion I accept as fact the testimony of Sheriff's officers that petitioner was neither beaten nor carried both to and from the temporary headquarters in the early morning hours.[4]

However, it is undisputed that petitioner was shuttled continuously back and forth between county jail and the temporary headquarters. This process evidently commenced on the first day of his detention for one Deputy Sheriff testified that he saw petitioner at the temporary headquarters on the evening of January 7. (T. 345, 346). Another Deputy Sheriff testified that petitioner was carried to the headquarters on at least half a dozen occasions, (T. 332), and other officers testified that they saw petitioner there on at least three or four occasions. Thus petitioner was taken to the temporary headquarters at least once a day, but the hours at which he was taken there or returned and what was done while he was there are veiled in mystery. The transcript does indicate that petitioner was interrogated at the headquarters, but there is no direct evidence of the number of times he was interrogated; indeed, there are only a few references by individual officers concerning occasions on which they questioned him for short periods of time. On the basis of the record before me, however, I can conceive of no legitimate

---

2. See Tex.Code Crim.P. art. 217 (1925), substantially revised in other respects in Tex.Code Crim.P. arts. 14.06, 15.17 (1965).

3. Sheriff's officers did permit petitioner's mother to leave money with the jailer to buy items for petitioner's comfort, and she was also permitted to leave various items of food. (T. 99). Petitioner's undisputed testimony was that he received nothing until a week after his arrest, (T. 317), but the transcript does not indicate the exact date on which his mother first left money or food at the jail. However, petitioner's mother was not allowed to see him for two weeks after

his arrest. (T. 296–97). On the occasions when petitioner was allowed to receive these items, he was taken to Deputy Frazier's office. There, by Deputy Frazier alone, he was given candy, comic books, and soda pop, but he was not informed that they were from his mother. (T. 97–100, 296–97).

4. Most of the investigating officers who testified at petitioner's trial stated that they worked until 3:00 in the morning on some occasions, and others testified that several times they worked at the headquarters all night. Thus petitioner could have been taken to the headquarters and questioned at any hour. See (T. 362).

purpose for shuttling petitioner back and forth to the headquarters other than for interrogating him. There were no witnesses to the crime and thus petitioner would not have been carried to the headquarters for identification purposes. Moreover, the temporary headquarters was the place from which investigating officers worked and would be the logical place for interrogation to occur. Judging from these facts, coupled with the number of times he was taken to the headquarters, I must conclude that petitioner at the least was subjected to persistent questioning. A contrary finding would be unreasonable.

On January 10, serious attention focused on petitioner as the murderer. Sheriff Kern questioned him on that day, (T. 81), and officers rounded up people who had worked with him and who lived in his neighborhood in an attempt to discover the murder weapon, *which was never found.* Several persons were picked up at about 6:00 in the evening on January 10 and taken to the temporary headquarters. (T. 189, 239, 252). There they were questioned until 3:30 in the morning of January 11, and then taken to the county jail where they were detained in an office used by the Sheriff's Department. A small nine-year old girl was picked up at 6:00 also, was taken to the headquarters and questioned, but was returned to her home at 12:00 that evening. (T. 253). All with the exception of the little girl testified that they were beaten, but this was denied. However, it is undisputed that they were questioned about whether they knew if petitioner and Sampson had committed the murder and if they knew where the

murder weapon was. They were not released until 11:00 on the evening of January 11, and during this time they were given no food.

Petitioner confessed to the crime on January 11 at approximately 10:00 in the evening. He had been at the temporary headquarters at least since 6:00 or 7:00 that evening, (T. 37), but the transcript does not indicate when he arrived, nor does it indicate what length of questioning preceded the confession. Investigator Walsh of the District Attorney's office began typing petitioner's confession at 10:00, (T. 381), although it appears that petitioner did not sign it until some time between 12:00 and 2:00 the next morning, January 12.[5] The confession itself was not transcribed in petitioner's own words, but instead was composed by Investigator Walsh. (T. 56).

■■ Two factors that have customarily been present in cases in which confessions have been found involuntary are not clearly present here. The evidence was in conflict concerning whether petitioner was physically mistreated, and there was no evidence to show that he was subjected to prolonged or gruelling sessions of interrogation. The absence of these two factors, however, does not ipso facto mean that a confession is voluntary. See, *e. g.*, Fikes v. State of Alabama, *supra*; Malinski v. People of State of New York, 324 U.S. 401, 65 S.Ct. 781, 89 L.Ed. 1029 (1945). Just as it has been recognized that there may be torture of the mind as well as of the body, Watts v. State of Indiana, supra, 338 U.S. at 52, 69 S.Ct. at 1349, it has also been

---

5. Estimates of the time at which the confession was signed varied by four hours. One witness testified that the confession was signed at 10:00 P.M., (T. 363), but this could not be true if Investigator Walsh did not begin typing it until that hour. Another witness placed the time of signing at some hour after midnight, (T. 370), while a newspaper reporter fixed the time at 2:00 A. M., immediately before his newspaper deadline. (T. 378) After petitioner signed the confession, he was taken to

the Sheriff's Department where he was photographed in the nude at 2:00 A. M., (T. 336), and then to the Jefferson Davis Hospital where he was examined by a doctor at 3:30 A. M. (T. 386). Since it is highly unlikely that petitioner would have been detained at the temporary headquarters for three or four hours after signing the confession before proof was secured that he had not been beaten, I think the testimony placing the time of signing between 12:00 and 2:00 A. M. should be accepted as true.

recognized that mental torment may be induced in various ways. See Payne v. State of Arkansas, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958); Fikes v. State of Alabama, *supra*; Malinski v. People of State of New York, *supra*. Numerous factors recognized by the Supreme Court as militating against a finding of voluntariness are present here. Petitioner was arrested and detained illegally;[6] he was not taken before a magistrate as required by State law;[7] he was not advised of his constitutional rights;[8] he was held incommunicado for five days and not permitted to have visitors;[9] he was subjected to persistent questioning;[10] and the confession was composed by one of the investigating officers.[11] Moreover, treatment accorded by the Sheriff's Department to other persons who became involved in the investigation indicate the callous attitude with which the murder investigation was conducted and compels a court to take with a grain of salt their statements that petitioner was not treated in a similar manner.[12]

■ If these factors were all that were present, however, I would not conclude that petitioner's confession was involuntary. "The limits in any case depend upon a weighing of the circumstances of pressure against the power of resistance of the person confessing, [since] [w]hat would be overpowering to the weak of will or mind might be utterly ineffective against an experienced criminal." Stein v. People of State of New York, *supra*, 346 U.S. at 185, 73 S.Ct. at 1093 (Jackson, J.). Although all these circumstances might prove taxing to the person of ordinary character, I could not say that in combination they would be such as to require the conclusion that a statement rendered under such circum-

stances was "not the product of any meaningful act of volition." Blackburn v. State of Alabama, *supra*, 361 U.S. at 211, 80 S.Ct. at 283.

■ But the transcript demonstrates that petitioner was not the ordinary person. Apparently, he had never been in trouble with the law before. At the time of his arrest and trial, petitioner, a Negro youth of 18 years of age, had only a seventh grade education. One witness who observed the signing of the confession testified that he would classify petitioner as a moron, (T. 377), while the doctor who examined petitioner after he had confessed testified that petitioner was "not intelligent for a boy of his age." (T. 387). These facts, I think compel a conclusion that petitioner's confession was involuntary. Decisions of the Supreme Court indicate that, when an accused is young or ignorant, the factors previously mentioned as weighing against a conclusion that a confession is voluntary take on added weight. *Cf.* Clewis v. State of Texas, *supra*; Gallegos v. State of Colorado, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962); Haley v. State of Ohio, *supra*. Viewing the facts as a whole, and in light of petitioner's character, I think they present an inherently coercive situation, inconsistent with the conclusion that petitioner's confession was a rational expression of free choice. Ashcraft v. State of Tennessee, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192 (1944). See also Watts v. State of Indiana, *supra*; Turner v. Com. of Pennsylvania, *supra*; Harris v. State of South Carolina, 338 U.S. 68, 69 S.Ct. 1354, 93 L.Ed. 1815 (1949); Malinski v. People of State of New York, *supra*.

For the reasons stated herein, it is hereby ordered, adjudged, and decreed that the petition for writ of the habeas

---

6. Payne v. State of Arkansas, *supra*.

7. Haley v. State of Ohio, *supra*.

8. Blackburn v. State of Alabama, *supra*; Fikes v. State of Alabama, *supra*.

9. Turner v. Com. of Pennsylvania, 338 U.S. 62, 69 S.Ct. 1352, 93 L.Ed. 1810 (1949).

10. Compare Fikes v. State of Alabama, *supra*.

11. Davis v. State of North Carolina, *supra*; Blackburn v. State of Alabama, *supra*.

12. See Haley v. State of Ohio, *supra*, 332 U.S. at 600, 68 S.Ct. at 304.

corpus is granted. The State of Texas shall have ninety (90) days from this date to grant petitioner a new trial, failing which he shall have his release.

This constitutes a final judgment.

True copies hereof will be forwarded by the Clerk to the petitioner and the attorneys of record.