Alton J. LAVALLIS

v.

W. J. ESTELLE, Director, Texas Department of Corrections.

Civ. A. No. 73–H–367.

United States District Court,
S. D. Texas,
Houston Division.

Jan. 23, 1974.

Robert G. Richardson, Staff Counsel for Inmates, Huntsville, Tex., for petitioner.

Jack Boone, Asst. Atty. Gen., Austin, Tex., for respondent.

## MEMORANDUM AND ORDER

SINGLETON, District Judge.

On January 10, 1968, petitioner was convicted in state court of murder with malice. A jury assessed his punishment at fifty years in the Texas Department of Corrections. His conviction was affirmed by the Texas Court of Criminal Appeals October 15, 1969.[1]

His state remedies exhausted, petitioner filed this application for writ of habeas corpus under Section 2241 et seq., Title 28 U.S.C., and is proceeding in forma pauperis under Section 1915, Title 28 U.S.C. By his application, petitioner alleges that his confinement is in violation of rights secured by the Constitution of the United States. Specifically, he complains first that the conviction in state court was based upon a confession that was the product of a custodial interrogation not preceded by *adequate Miranda*[2] warnings; and second, that his alleged waiver of his right to counsel at the interrogation and his right to remain silent was ineffective in that by virtue of his mental subnormality he was incapable of making a knowing and understanding waiver. Because of the particular issues presented, a factual background is necessary.

## THE FACTUAL BACKGROUND

It was 6:30 in the morning on March 27, 1967, when the police dispatcher in La Porte, Texas, first learned that the body of a black female was pinned under a 1959 Ford automobile in a vacant lot at the corner of Adams and North Fourth streets; the woman was believed to be dead; and the whereabouts of the driver was unknown. The chief of police, H. F. Freeman, Jr., finished a cup of coffee and went to the scene to investigate. Shortly thereafter, a young black resident of La Porte, Alton Lavallis, walked into the police station and sat down on a bench near the dispatcher, apparently unnoticed. Another broadcast regarding the investigation at the scene came over the dispatcher's radio. Lavallis, hearing the broadcast, said to the dispatcher, "I done that out on North Fourth." Lavallis was immediately placed in a cell.

Chief Freeman returned to the police station about 8:00 a. m. in the morning after taking pictures of the scene. He was told what Lavallis had said and that he was in custody in one of the cells. As Freeman approached, Lavallis said, "I run over Dorothy." Freeman instructed Officer Thomas to take Lavallis to Judge V. L. "Bud" West's office to receive his "statutory warning."

Shortly after 8:00 Lavallis was presented to Judge West (Judge West's office is two blocks from the police station). West told Lavallis that he was suspected of murder (by this time it had been learned that the woman was Dorothy Kennedy and that she was dead), that he had the right to remain silent, that "anything he said could be used against him in any trial pertaining to the case," that he was entitled to an attorney, that if he could not afford an attorney one would be appointed to represent him, that he was entitled to have an attorney "present at the time," that he could stop talking anytime he wanted to, and then personally advised Lavallis to get an attorney before he said anything. The warning lasted "not more than ten minutes." During the warning Lavallis said nothing but indicated his answers to the judge's questions by nodding. The judge was familiar with Lavallis' mental subnormality and talked to him on an informal basis. The judge was personally satisfied that Lavallis understood the warnings.

He was then taken back to an office in the La Porte station by Officer Thomas. There Chief Freeman told him that he wanted a statement. Lavallis indicated that he would give one.

---

1. Lavallas v. State, 444 S.W.2d 931 (Tex.Cr. App.1969).

2. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

He sat down across the desk from Chief Freeman in the small office. Officer Thomas was also in the office and another officer, Lafitte, stood in the only doorway to the office. The interrogation began with Freeman reading the Texas statutory warnings then in effect from the top of the confession form. He read the warnings slowly and asked Lavallis three or four times whether he understood them. He was personally satisfied that the warnings were understood. Lavallis was not told at that time that he was entitled to have an attorney present during the interrogation nor was he told that he could terminate the interrogation at any time. For about an hour Lavallis would relate his story and Chief Freeman would type what he said.

When Lavallis finished with his statement, a secretary was called into the small office. She read the typed statement to him stopping at different intervals and asking him if he understood what she had read. When she finished, Lavallis indicated he understood what she had read and signed the statement. The signing was witnessed by the three officers and the secretary.

The Harris County Grand Jury returned an indictment for the crime of murder with malice April 14, 1967. On September 8, 1967, an attorney was appointed to represent Lavallis at trial. The trial began on January 8, 1968, at which time Lavallis pleaded not guilty and filed a motion to suppress the confession on the ground that his in-custody, extra-judicial confession was not voluntary and was not admissible in evidence because the statement was not preceded by adequate *Miranda* warnings.

The trial judge, Honorable Wendell A. Odom (now on the Court of Criminal Appeals) denied the motion after conducting a Jackson v. Denno [3] hearing, concluding that the warnings which were given complied with the dictates of *Miranda* and that Lavallis had voluntarily waived his sixth amendment right to counsel and his fifth amendment right not to incriminate himself.

## THE MIRANDA WARNINGS

It is undisputed that the interrogation of petitioner was custodial and that the confession was made on March 27, 1967, subsequent to the date of *Miranda* which was decided June 13, 1966. Thus the requirements of *Miranda* are fully applicable to the issue of the confession's admissibility at petitioner's trial in January of 1968. Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966).

The requirement of *Miranda* which is critical in this case is that "an individual held for interrogation must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation." 384 U.S. at 471, 86 S.Ct. at 1626. Based on the language of *Miranda* itself that such a warning is an "absolute prerequisite to interrogation," [4] this circuit has demanded a strict compliance with this required warning, Sanchez v. Beto, 467 F.2d 513 (5th Cir. 1972), Lathers v. United States, 396 F.2d 524 (5th Cir. 1968), Chambers v. United States, 391 F.2d 455 (5th Cir. 1968), Windsor v. United States, 389 F.2d 530 (5th Cir. 1968), and has rejected the less stringent rule of the Second Circuit that the requirements of *Miranda* are satisfied under circumstances in which, although there is no evidence that the accused was told of his right to the presence of

---

3. Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). It is noted that the issue of the voluntariness of the confession was not submitted to the jury. Under article 38.22 of the Vernon's Ann. Texas Code of Criminal Procedure the jury should be given the opportunity to determine the voluntariness of a confession even though the trial judge has concluded that the confession was voluntary. Taylor v. State, 498

S.W.2d 346 (Tex.Cr.App.1973) (concurring opinion). However, there was no objection to the charge given to the jury on this point and the issue was neither raised on appeal, by state writ of habeas corpus, or by writ of habeas corpus in federal court. Accordingly, this court does not reach this issue.

4. 384 U.S. at 471, 86 S.Ct. 1772.

an attorney, an inference can be drawn to that effect. See, *e. g.*, United States v. Cusumano, 429 F.2d 378 (2nd Cir.), cert. denied, 400 U.S. 830, 91 S.Ct. 61, 27 L.Ed.2d 61 (1970); United States v. Lamia, 429 F.2d 373 (2nd Cir.), cert. denied, 400 U.S. 907, 91 S.Ct. 150, 27 L.Ed.2d 146 (1970).

The test in this circuit is well stated in Lathers v. United States, *supra*, 396 F.2d at 535:

"The Miranda warning must effectively convey to the accused that he is entitled to a government-furnished counsel *here and now*. If the words are subject to the construction that such counsel will be available *only in the future*, Miranda has not been obeyed. Although there is no talismanic or heraldic abracadabra which must be fulfilled, the offer of counsel must be clarion and firm, not one of mere impressionism."

The application of the rule is simple. If an accused was "advised of his right to speak to or consult with an attorney, but was not advised that he was entitled to the *presence* of an attorney, retained or appointed, during the interrogations," the *Miranda* criteria for admissibility is not met. Windsor v. United States, 389 F.2d 530 (5th Cir. 1968); Chambers v. United States, *supra* 391 F.2d at 456. If this critical part of the warning is not given, it matters not that the rest of the warning was given "over and over again" or that there is no indication of an "affirmative misleading" by the police officer. *Cf.* Sanchez v. Beto, *supra* 467 F.2d at 514, 516; see also, Blackburn v. Alabama, 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960).

In this case, petitioner was "warned" of his constitutional rights twice: once by a magistrate and again by the officer who took the confession. From the testimony adduced at the habeas corpus hearing and from the testimony at trial, it is clear that the warning given by the officer taking the confession was inadequate.

Chief Freeman testified that he read the warnings that were printed on the top of the confession form which were the statutory warnings required by Article 15.17 of the Texas Code of Criminal Procedure then in effect. Article 15.17, V.A.C.C.P., had been enacted in response to Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) and did not contain the requirement that the individual subjected to interrogation must be warned that he has the right to the presence of an attorney, retained or appointed at the interrogation.[5] And even though Article 15.17 was amended on August 28, 1967, so as to add this critical requirement, since it was not in effect on the date that the confession was taken, Chief Freeman did not tell petitioner that he was entitled to the presence of an attorney at the interrogation. This much is clear from the record. What is not so clear is whether Judge West's warning contained the critical admonition.

At the evidentiary hearing conducted by this court, Judge West testified that he "read" Alton his "statutory warnings" from "a little green book of the code of criminal procedure—handbook," and although he added "some things to the warning that were not in the book" other than to "explain certain words," nothing else was added. This testimony, considered by itself, obviously indicates that his warning was insufficient for the same reason that Chief Freeman's was. However, Judge West's testimony at the Jackson v. Denno suppression hearing conducted over four years earlier indicates otherwise. At that hearing, on cross-examination, the following colloquy occurred:

"Q: (By defense counsel) Judge West, did you use a printed form in giving this warning or do you do this from memory?

---

5. Charles v. State, 424 S.W.2d 909, 920 (Tex.Cr.App.1967), cert. denied, 392 U.S. 940, 88 S. Ct. 2319, 20 L.Ed.2d 1401 (1968).

"A: I did not. He was warned from memory. I am satisfied that I signed a form that the police department gave me.

"Q: All right, as far as reading him any sort of a legal warning, you did not do so?

"A: I did not read him any legal warning.

\*    \*    \*    \*    \*    \*

"Q: Did you tell him that he had the right to have an attorney present during any interview with anyone representing the State of Texas, either a police officer or District Attorney or anyone?

"A: I don't think I went into detail, no, *but I did tell him he had a right to an attorney and before he said anything I advised him to have an attorney.*

"Q: You did not specifically though tell him what I said?

"A: I am sure I did.

"Q: Did you specifically tell him, Judge West, that he had the right to terminate any interview at any time he so chose?

"A: I did not tell him in those words but *I did tell him he could stop talking any time he wanted to.*" (S/F 137–141)    (Emphasis added.)

Judge West also testified, in response to other questions, that he warned Alton that he "was entitled to an attorney and if he did choose to make any statement he was entitled to have an attorney present at the time . . ." (S/F 135) and that he ". . . took special pains in this case to tell him he was entitled to an attorney . . ." (S/F 143) and that he ". . . advised him to get an attorney before he said anything." (S/F 144)

■■    Taking all of the testimony into consideration, it is this court's conclusion that the warnings given to Alton by Judge West were sufficient to comply with the commands of *Miranda.* And since the interrogation began only minutes after Judge West's warnings, the fact that Chief Freeman's subsequent warnings were inadequate is less consequential and did not render the confession inadmissible.

## MENTAL SUBNORMALITY

Petitioner's second ground for habeas relief is that assuming, arguendo, adequate *Miranda* warnings were given him, because of his limited mental capacity, he was incapable of knowingly waiving his constitutional rights.

> "*Miranda*, of course, holds that a confession obtained without warning the suspect of his rights to remain silent and to the assistance of counsel is not admissible. But the converse of that rule does not automatically follow. The fact that the requisite warning has been given and a waiver obtained does not bar the courts from scrutinizing the circumstances of the confession to determine whether its admission comports with constitutional guarantees."

Cooper v. Griffin, 455 F.2d 1142, 1145–1146 (5th Cir. 1972).

■■    The Supreme Court's pronouncements on waiver are often repeated. Waiver is defined as "an intentional relinquishment or abandonment of a known right or privilege," Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938), and "Courts should 'indulge every reasonable presumption against waiver.'" Barker v. Wingo, 407 U.S. 514, 525, 92 S.Ct. 2182, 2189, 33 L.Ed.2d 101 (1973), quoting from Aetna Ins. Co. v. Kennedy, 301 U.S. 389, 393, 57 S.Ct. 809, 81 L.Ed. 1177 (1937).

> "Presuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandably rejected the offer. Anything less is not waiver."

Carnley v. Cochran, 369 U.S. 506, 516, 82 S.Ct. 884, 890, 8 L.Ed.2d 70 (1962).

With these standards in mind, a closer look is given to the circumstances surrounding the confession.

Dr. John Marshall, a psychiatrist employed by the Texas Department of Corrections, testified that Lavallis was tested once in 1971 and again a few days prior to the evidentiary hearing conducted by this court. An evaluation of the several tests administered to Lavallis produced the conclusion he was a "borderline Mental Defective" with a present I.Q. of 71, placing him within 5% of the general population in intelligence.[6] The doctor explained that it is normal that a person's I.Q. will increase with age, leaving the inference that his I.Q. was probably lower at the time the confession was given. He further testified that Lavallis would have particular difficulty in understanding ideas that entail an appreciation of future events or reasoning in the abstract. However, he concluded that Lavallis could have understood his rights and that he was waiving them if the person explaining these concepts to him "got down on his level" and used simple vocabulary, pausing between statements, and placed no pressure on him. He added that repetition enhances his ability to understand and that it is helpful if the words are pronounced distinctly. He explained that a person who has known Lavallis for a number of years and a layman in the psychological vocabulary field could possibly communicate with him easier than the doctor himself.

Judge West testified that he had known Lavallis and his entire family for about six years prior to the date of the confession; that Lavallis had worked for him in his nursery business from 1963 to 1966; that he knew Lavallis was not intelligent, elaborating that concerning nursery business he had to explain directions to Lavallis slowly but that Lavallis was able to carry out the tasks and was able to do a "very good job." He testified that when he gave the warnings to him he spoke slowly and repeated himself; that, although Lavallis was in the company of an officer, he was not handcuffed; and that he talked to him on an informal basis. He remembered asking him if he knew what "counsel" was, that Lavallis said "No," that he explained counsel to him and that Lavallis indicated by shaking his head that he understood. He also remembered personally advising Lavallis to get an attorney before he said anything. He said that he was particularly careful to see that Lavallis understood the warnings and was certain that he did.

Chief Freeman testified that he also had known Lavallis for approximately six years prior to the confession; that he was aware that he was "kinda slow"; and that for this reason he asked him "two or three times" whether he understood the warnings, and in so doing he "used words [he] felt like [Lavallis] could understand." He testified that he was satisfied that he understood the warnings.[7] He further testified that after the confession was typed, a secretary read the confession back to Lavallis slowly, pausing between statements and that Lavallis indicated that the typed version was correct and signed it.

The general rule which is indicated by the decisions of the Supreme

---

**6.** The conclusion that Lavallis' I.Q. is now 71 was based on the results of a Weshsler Adult Intelligence Scale test which was administered shortly before the habeas corpus hearing in this court. The same test administered in 1971 showed Lavallis to have an I.Q. of 65, which is mentally defective and a score that fewer than 2% of the general population would likely score on the same test.

**7.** It should be noted again that Chief Freeman did not warn Lavallis that he could terminate the interrogation at any time or that he was entitled to the presence of an attorney at the interrogation—it is this fact that makes this case an extremely close one. Compare Sanchez v. Beto, 467 F.2d 513 (5th Cir. 1972); Lathers v. United States, 396 F.2d 524 (5th Cir. 1968). However, since Lavallis had once been warned of these rights only a few minutes prior to the interrogation by Freeman, the omission is not fatal. In neither *Sanchez* nor *Lathers* were the critical warnings ever given.

Court,[8] the Fifth Circuit,[9] and the Texas Court of Criminal Appeals [10] is that the fact that a confession is made by one whose mentality is subnormal is to be taken into consideration and viewed *as a fact indicating, although not establishing,* that the confession was lacking in voluntariness.

Cooper v. Griffin, 455 F.2d 1142 (5th Cir. 1972) relied upon by petitioner appears at first blush to be directly in point and controlling. The panel there held that two brothers who were 15 and 16 years old when taken into custody, had no previous experience with the criminal process, whose I.Q.'s ranged between 61 and 67 and whose reading comprehension was not above the second or third grade level were incapable of making a knowing and intelligent waiver of their rights even though full *Miranda* warnings were given to them prior to their confessions. However, there is at least one important factual distinction between *Cooper* and the instant case. The psychiatrist that examined Marvin Cooper testified that "he did not believe Marvin was capable of intelligently waiving his constitutional rights." *Id.* at 1144. In the instant case, the psychiatrist testified that Lavallis could under the proper circumstances understand and waive his rights. Being factually different and because this circuit embraces the necessary "case by case approach" (United States v. Montos, 421 F.2d 215 (5th Cir. 1970)), the conclusion there is not controlling here.

Likewise, the recent opinion in Davis v. Henderson, 473 F.2d 679 (5th Cir. 1973) [decided January 16, 1973] is not controlling factually. In *Davis,* two psychiatrists who had examined him testi-fied that he "could have intelligently understood the magnitude of his action (pleading guilty) if—and only if—they [his constitutional rights] were simply and clearly explained." *Id.* at page 679. Noting that there is a strong presumption against the waiver of vital constitutional rights, the panel held by per curiam opinion that the district court's sole reliance on minute entries indicating that the petitioner had waived his constitutional rights was insufficient to overcome the presumption. In the instant case, the respondent has alleged and offered evidence that the petitioner voluntarily waived his rights.

Also factually distinguishable is this court's decision in the pre-Miranda case of Gilbert v. Beto, 274 F.Supp. 847 (S. D.Tex.1967). Like most cases concerning mental subnormality, it was decided on the accumulative effect of many factors which negated voluntariness. In addition to the fact that Gilbert did not possess normal intelligence were the facts that he

"was arrested and detained illegally; he was not taken before a magistrate as required by State law; he was not advised of his constitutional rights; he was held incommunicado for five days and not permitted to have visitors; he was subjected to persistent questioning; and the confession was composed by one of the investigating officers." 274 F.Supp. at 853 (footnotes omitted).

None of these additional factors were present in the instant case.

■ Considering other factors that have been held relevant to the issue of voluntariness, it is observed that there was no violence [11] or threats of vio-

8. See Sims v. Georgia, 389 U.S. 404, 88 S. Ct. 523, 19 L.Ed.2d 634 (1967); Fikes v. Alabama, 352 U.S. 191, 77 S.Ct. 281, 1 L. Ed.2d 246 (1957); Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957); McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 319 (1943).

9. See Sanchez v. Beto, 467 F.2d 513 (5th Cir. 1972); Cooper v. Griffin, 455 F.2d 1142 (5th Cir. 1972); Lathers v. United States, 396 F.2d 524 (5th Cir. 1968); Malignaro v. Smith, 408 F.2d 795 (5th Cir. 1969).

10. See Bizzarri v. State, 492 S.W.2d 944 (Tex.Cr.App.1973); Nash v. State, 477 S. W.2d 557 (Tex.Cr.App.1972); Casias v. State, 452 S.W.2d 483 (Tex.Cr.App.1970); Vasquez v. State, 163 Tex.Cr.R. 16, 288 S. W.2d 100 (1946); Hanus v. State, 104 Tex. Cr.R. 543, 286 S.W. 218 (1928); Grayson v. State, 40 Tex.Cr.R. 573, 51 S.W. 246 (1899).

11. See Beecher v. Alabama, 389 U.S. 35, 88 S.Ct. 189, 19 L.Ed.2d 35 (1967).

lence;[12] no direct or indirect promises;[13] the interrogation was neither long in duration nor intense;[14] and there is no indication of any physical deprivations.[15]

Prior confessions have been considered relevant in some cases in determining whether a later confession given by the same person was voluntary.[16] In this regard, it is noted that prior to the interrogation Lavallis had volunteered the incriminating statements: "I done that out on North Fourth" and "I run over Dorothy."

It should be underscored, however, that although the fact that Lavallis made two "res gestae," incriminating statements prior to the confession is considered by this court to be a part of the relevant circumstances surrounding the confession, little weight is given to the fact because at the time of the utterances he had not been informed of his constitutional rights.

It is further observed that during final jury arguments Lavallis' court-appointed attorney made the following statement:

> ". . . in this case I think this is a voluntary confession and such—as far as physical brutality there is not one bit in this case and I think you can take into consideration what I considered or concluded from the atmosphere of the officers and their testimony, I don't think there was one ounce of vindictiveness in one of those officers." (S/F 183).

Mention is made by the respondent that this statement may constitute a waiver of the issue of voluntariness. If this be the intended argument of the respondent, it is rejected. A different ruling may be called for in a situation where the defendant himself takes the stand and admits his confession was voluntarily made. However, this issue is not presented by the evidence and is not reached by this court.

Finding that an adequate *Miranda* warning was given and considering the totality of the circumstances surrounding the interrogation and confession, this court concludes that petitioner voluntarily relinquished his privilege against self-incrimination and knowingly waived his right to counsel.

Accordingly, the petition for writ of habeas corpus is denied.

---

12. See Garrity v. New Jersey, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967).

13. See Beecher v. Alabama, *supra*.

14. See Clewis v. Texas, 386 U.S. 707, 87 S. Ct. 1338, 18 L.Ed.2d 423 (1967); Darwin v. Connecticut, 391 U.S. 346, 88 S.Ct. 1488, 20 L.Ed.2d 630 (1968).

15. See Sims v. Georgia, *supra*; Greenwald v. Wisconsin, 390 U.S. 519, 88 S.Ct. 1152, 20 L.Ed.2d 77 (1968).

16. See Clewis v. Texas, *supra*; Beecher v. Alabama, *supra*; Darwin v. Connecticut, *supra*; Boulden v. Holman, 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433 (1969).