Larry D. TOLIVER, Petitioner,

v.

J. S. GATHRIGHT, Superintendent, Respondent.

Civ. A. No. 79–0995–R.

United States District Court, E. D. Virginia, Richmond Division.

Oct. 22, 1980.

MEMORANDUM

MERHIGE, District Judge.

Larry Darnell Toliver, an inmate in the Virginia Correctional system, petitions the court for a writ of habeas corpus, challenging his conviction in the Circuit Court for the City of Richmond on a charge of statutory burglary, for which he was sentenced to a term of six years in the penitentiary. Petitioner attacks his conviction on the grounds that the admission into evidence of an inculpatory statement violated his Fifth and Fourteenth Amendment privilege against self–incrimination.

Jurisdiction is founded on 28 U.S.C. § 2241. Petitioner's appeal to the Supreme Court of Virginia was refused, and defendant concedes that Toliver has exhausted his state remedies. The matter has been fully briefed by counsel, the Court has examined the trial transcript, and the issue is now ripe for disposition.

At trial, there was testimony to the effect that on the afternoon of September 12, 1978, petitioner and an individual named Smith went to a residence in Richmond. At Smith's instruction, Toliver rang the doorbell and engaged the resident in conversation. While Toliver and the resident talked, Smith broke into the house · through a screen door at the rear and stole a purse containing approximately $15.00.

The following day, Toliver and Smith were taken into custody by the Richmond police. Petitioner, who is mentally retarded, was interviewed by a Detective Weaver, who testified that he noticed petitioner was "mentally slow." [1] Weaver read petitioner his rights from a standard form, without explanation. Toliver, who asked no questions about the *Miranda* warnings, wrote his name at the bottom of the waiver form. Weaver then asked petitioner if he wished to make a statement concerning the burglary, to which Toliver replied, "No."

Weaver testified that he then left the interview room in order to speak with Smith. Several minutes later he returned, in the company of a Captain Bernhard.

Charles W. Peraino, Richmond, Va., court appointed, and Larry D. Toliver, pro se, for petitioner.

Robert E. Bradenham, II, Asst. Atty. Gen., Richmond, Va., for respondent.

---

1. Transcript of state court trial, p. 20.

Weaver told Toliver that Smith had made a statement which implicated petitioner in the burglary. Toliver's immediate response is unclear from the record. However, it was undisputed that after he had been informed of the statement Smith made implicating him, Toliver answered questions propounded by Weaver. The questioning lasted for approximately 35 minutes, and elicited a full and detailed confession.

Petitioner makes two arguments in support of his claim that admission of his statement into evidence violated his constitutional privilege against self–incrimination. First, Toliver contends that the totality of the circumstances, in particular his mental deficiency, demonstrate that he could not have made, and in fact did not make, a knowing waiver of his right to remain silent.

■■■ It is elementary that in order to execute a valid waiver of the right to counsel or the right to remain silent, a suspect must comprehend the meaning and importance of those rights. "The requirement of 'knowing and intelligent' waiver implies a rational choice based upon some appreciation of the consequences of the decision." *Cooper v. Griffin*, 455 F.2d 1142, 1146 (5th Cir. 1972). .Because the rights embodied in the *Miranda* warnings are crucial to "a fair state–individual balance," *Miranda v. Arizona*, 384 U.S. 436, 460, 86 S.Ct. 1602, 1620, 16 L.Ed.2d 694 (1966), and because it is the police who control the circumstances of custodial interrogation, "a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived" his rights. *Miranda*, 384 U.S. at 475, 86 S.Ct. at 1628.

■■ Involving as it does an evaluation of the accused's subjective state of mind, the issue of waiver of constitutional guarantees cannot be made to turn on any single factor, such as whether the suspect signed a waiver form. *Cooper v. Griffin, supra; Blackmon v. Blackledge*, 541 F.2d 1070 (4th Cir. 1976). Rather, the inquiry must in-

volve a careful analysis of the "totality of the circumstances," *Lunnermon v. Peyton*, 310 F.Supp. 323, 325 (W.D.Va.1970), *aff'd*, 440 F.2d 774 (4th Cir. 1971), including the suspect's mental capacity, educational level, and experience with the criminal justice system, as well as the manner in which the *Miranda* warnings are given, and the nature of any statement or action on the part of the suspect alleged to evince comprehension and waiver of the rights. *United States v. Glover*, 596 F.2d 857 (9th Cir. 1979); *Levallis v. Estelle*, 370 F.Supp. 238 (S.D.Tex.1974), *aff'd*, 500 F.2d 1182 (5th Cir. 1974).

For the reasons which follow, the Court finds it unnecessary to a disposition of this case to decide whether or not the petitioner comprehended his *Miranda* warnings. The Court notes, however, that it would be hard pressed to find that the state met its "heavy burden" of demonstrating a knowing waiver. It is uncontradicted that Toliver's I.Q. places him within the range of mental retardation.[2] His rights were read to him in a summary fashion, without elaboration; at trial, petitioner's expert witness, a psychiatrist, expressed the opinion that individuals of Toliver's mental capacity are generally unable to comprehend complex ideas without detailed explanation. While it has been held that the fact that a suspect is of limited mental capacity is not dispositive on the issue of waiver where the circumstances support the conclusion that he did in fact comprehend his rights, *Lunnerman v. Peyton*, 310 F.Supp. 323 (W.D. Va.1970), *aff'd* 440 F.2d 774 (4th Cir. 1971); *Levallis v. Estelle*, 370 F.Supp. 238 (S.D. Tex.), *aff'd* 500 F.2d 1182 (5th Cir. 1974), this is not the case here.

■■ The trial court refused to allow Toliver's expert witness to give a specific opinion as to whether Toliver was capable of comprehending his rights as they were read to him by Detective Weaver, apparently on the grounds that any opinion to the

**2.** At trial, petitioner's expert testified that Toliver had an I.Q. of approximately 60. Tran-

script of state court trial, p. 20.

effect that Toliver was incapable of understanding was "contrary to the evidence."[3] In the trial court's view, the fact that petitioner initially declined to make a statement definitively proved that he understood his rights.[4] The Court, however, is of the opinion that the fact that a suspect initially refuses to make a statement cannot reasonably be seen as tending to show, much less as proving, that he comprehends the full panoply of constitutional protections, or that a subsequent statement is the result of a knowing and intelligent waiver. Indeed, the fact that Toliver said he would not make a statement, just moments after he signed the waiver form, evinces confusion rather than comprehension. Under these circumstances, the holding that Toliver understood and waived his rights does not, in the Court's view, comport with the obligation of courts to "indulge every reasonable presumption against waiver of fundamental constitutional rights." *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938).

■ However, even if the Court were persuaded that Toliver did in fact understand his rights, it would nonetheless be required to hold that admission of his confession into evidence violated his constitutional privilege against self–incrimination. For the Court is in agreement with peti-

tioner's second claim: that Weaver's statement to petitioner that Smith had implicated Toliver in the crime constituted interrogation, in violation of the mandate of *Miranda* to the effect that all questioning must cease once a suspect in custody has invoked the right to remain silent or the right to counsel.

The trial court rejected petitioner's second contention, apparently on the grounds that Toliver could "still remain silent" in the face of Weaver's statement, and that Toliver's breaking silence when confronted with the knowledge that Smith had implicated him was "the common reaction of people in difficulty."[5] The Court respectfully suggests that such is not the appropriate test; for the standard is not whether a statement could, in some metaphysical sense, be deemed "voluntary", or whether making a statement under such circumstances is "common" or understandable. Rather, the inquiry goes to whether "appropriate measures were taken to safeguard [the accused's] rights and to ensure that his statements were the product of free choice." *United States v. Clark*, 499 F.2d 802, 806–807 (4th Cir. 1974).

It was uncontradicted that when Weaver asked petitioner whether he would like to make a statement, Toliver replied, "No." Regardless of the extent to which Toliver

---

**3.** Transcript of state court trial, p. 27.

**4.** When counsel for petitioner sought to have the expert give a specific opinion as to whether a person of Toliver's mental capacity is capable of understanding his rights as they were read by Detective Weaver, the following exchange took place:

THE COURT: How can the doctor possibly testify that he understood his rights? His guess on that is as good as mine, because what he is saying is, 'I don't want to make a statement', so apparently he understood the statement. You have to base it on the evidence.

\* \* \* \* \* \*

MR. PERAINO: Isn't one of the issues whether he understood his *Miranda* rights? THE COURT: He said, 'I don't want to make a statement.' With that mental deficiency, they would say, 'I will make a statement.' Transcript of state court trial, pp. 26–28.

**5.** After the judge refused to exclude the confession, the following exchange occurred between the Court and counsel for petitioner:

MR. PERAINO: I make the exception on the grounds that when the police came and told him that somebody else made a statement and therefore he should make it, that is coercion. THE COURT: They didn't say that. All they said was, they were talking about what Smith had told them, and he said, 'Wait a minute, I want to make a statement,' which to me is common sense, the common reaction of people in difficulty. 'I want to get my licks in, too.' MR. PERAINO: But your Honor ... Weaver admitted that he said to my client, 'Smith made the statement indicating you', and I believe the cases show that is coercion when you use somebody else's statement. THE COURT: He can still remain silent. Your exception is noted on the record. Transcript of state court trial, p. 30.

understood that in so doing he was exercising a right guaranteed him under the Constitution, his negative response brought into play the special procedural safeguards of *Miranda*: "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. [Footnote omitted.]" [6] *Miranda*, 384 U.S. at 473, 86 S.Ct. at 1627.

At this juncture, then, the issue is reduced to whether Weaver's statement to Toliver constituted "interrogation" in violation of *Miranda*. The Supreme Court has recently clarified the meaning of "interrogation" under *Miranda* in *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). In that case, Innis, at the time of his arrest, was advised of his rights three times. He said that he understood, and that he wanted to speak to an attorney. Innis was then placed in a police car with three officers, to be driven to the police station. En route, two of the officers engaged in a conversation concerning a shotgun involved in the crime of which Innis was accused, which had not been recovered. One of the officers stated that a school for handicapped children was located near the scene of the crime, and expressed to the other officer his fear that the children might find the gun and hurt themselves. At this point Innis interrupted, asked the officers to return to the scene, and said that he would show them where the gun was hidden. When the police car arrived at the scene, Innis was once again advised of his rights. He repeated that he understood, but said that he wanted to remove the gun because of his concern for the safety of the handicapped children. At Innis' trial, over his objection, the gun was introduced into evidence.

The Supreme Court held that the conversation between the two officers was not "interrogation" under *Miranda*. In so doing, the Court defined the type of police statements and conduct that are impermissible once an accused has invoked the right to counsel or the right to remain silent:

> We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that *the police should know are reasonably likely to elicit an incriminating response from the suspect.* The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. [Footnote omitted; emphasis added.]

---

6. In *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), the Supreme Court created a narrow exception to this general rule. In *Mosley*, the suspect, who had been properly advised of his *Miranda* rights, declined to discuss the robbery of which he was accused. Several hours later a different officer questioned Mosley about an unrelated murder. Fresh warnings were given before the second questioning began, and Mosley did not in any way indicate that he did not want to discuss the murder. The court found that the police had "fully respected", 423 U.S. at 104, Mosley's right to cut off questioning.

Respondent in the present case cites *Mosley*, claiming that it controls the present case because here, as in *Mosley*, the officer ceased questioning when the right to remain silent was invoked. However, the Court is of the opinion that *Mosley* is inapposite. There are in the present case no facts comparable to those relied upon by the *Mosley* court: that the second questioning was conducted by a different officer, and involved an unrelated crime; that fresh *Miranda* warnings were given prior to the second questioning; and that a significant period elapsed between interrogations. The Supreme Court clearly did not intend its holding to reach cases such as the present one, stating that, to "permit the continuation of custodial interrogation after a momentary cessation would clearly frustrate the purposes of *Miranda* by allowing repeated rounds of questioning to undermine the will of the person being questioned." 423 U.S. at 102, 96 S.Ct. at 325.

446 U.S. 291, 299–301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297. The Court referred to a number of facts that supported the conclusion that the officers' conversation was not the "functional equivalent" of interrogation. It noted that there was no reason for the officers to be aware that Innis would be particularly susceptible to an appeal to his conscience; that the conversation was not directed at Innis, did not appear to call for a response from him, and consisted of "no more than a few off–hand remarks"; 100 S.Ct. at 1689; and that there was no evidence to support an inference that the officers intended that their conversation have the effect of evoking Innis' sudden incriminating response.

Respondent cites *Innis* as support for his claim that Detective Weaver's statement was not interrogation. In the Court's opinion, however, the reasoning if not the direct holding of *Innis* compels the conclusion that Weaver's statement to Toliver was the "functional equivalent" of interrogation, in violation of petitioner's right to remain silent and his privilege against self–incrimination.

In the instant case, all of the circumstances point toward the conclusion that Weaver should have known that informing Toliver of Smith's statement implicating him was likely to prompt petitioner to incriminate himself. Unlike the officers' remarks in *Innis*, which could reasonably be viewed as an ordinary conversation, Detective Weaver's statement was directed to Toliver, and cannot plausibly be explained as anything other than an attempt to evoke precisely the response Toliver made. That Weaver hoped and intended [7] to prompt petitioner to break silence is further corroborated by the fact that he followed up on petitioner's initial response by questioning him at some length, eliciting a full and detailed confession. Whether or not Weaver intended to induce petitioner to make a statement, he must certainly have known that it was at least likely, if not probable, that Toliver would so respond. Confronting an accused with incriminating evidence is a common and traditional method of prompting a recalcitrant suspect to confess.[8] That it is also frequently an effective tactic may be judged from the volume of cases involving confessions so induced.[9] As the trial judge noted, and as Weaver surely knew, it is a "common reaction" for an accused to respond to incriminating evidence by speaking. Faced with evidence indicating that the police already believe him to be guilty, an accused may conclude that he has nothing to lose by making a statement, or may fear that silence will be taken as an admission of guilt.

A statement such as that made by Weaver is especially likely to evoke an incriminating response where, as in the present case, the suspect's mental capacity is severely limited. The *Innis* court recognized that effective protection of *Miranda* rights may require the police to take into account an individual's vulnerabilities: "Any knowledge that the police may have had concerning the unusual susceptibility of an defendant to a particular form of persuasion might be an important factor in determining whether the police should have known that their words or actions were reasonably likely to elicit an incriminating response

---

**7.** While the *Innis* standard "focuses primarily on the perceptions of the suspect," 100 S.Ct. at 1689, the Court noted that the intent of the police is not irrelevant,

> for it may well have a bearing on whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response. In particular, where a police practice is designed to elicit an incriminating response from the accused, it is unlikely that the practice will not also be one which the police should have known was reasonably likely to have that effect.

100 S.Ct. at 1690 n.7.

**8.** *See generally,* Y. Kamisar, *What is Interrogation? When Does it Matter?,* pp. 150–160, in *Police Interrogation and Confessions,* 1980.

**9.** *See, e. g., Bram v. United States,* 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897); *Ashcraft v. Tennessee,* 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192 (1944); *Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964); *United States v. Clark,* 499 F.2d 802 (4th Cir. 1974); *Blackmon v. Blackledge,* 541 F.2d 1070 (4th Cir. 1976); *Brown v. Cox,* 311 F.Supp. 81 (E.D.Va.1970).

from the suspect." 100 S.Ct. at 1690, n.8. Weaver admitted that he noticed Toliver's limited mental capacity at the outset of the interview, and should have known that Toliver, when faced with Smith's statement implicating him, was particularly likely to have an exaggerated perception of the dangers of remaining silent, or of the benefits of making a statement. The Court does not rely upon this special susceptibility of petitioner, for it deems a statement such as that made by Weaver so inherently likely to produce an incriminating response, even from a person of average intelligence, as to almost always constitute interrogation under *Innis*. Petitioner's retardation, and Weaver's awareness of it, are merely additional factors which make it difficult for the Court to conceive of a case more clearly within the limits of the *Innis* definition of the "functional equivalent" of interrogation.

Finally, as to respondent's contention premised on *Blackmon v. Blackledge*, 541 F.2d 1070 (4th Cir. 1976); *Brown v. Cox*, 311 F.Supp. 81 (E.D.Va.1970), that there is authority within the Fourth Circuit which specifically approves the tactic of confronting an accused with incriminating evidence, it is to be noted that those cases are readily distinguishable in that they involved suspects who had waived the right to remain silent. They do not stand for the proposition that confronting an accused with evidence against him is not "interrogation": they merely hold that it is an acceptable *form* of interrogation, absent trickery or coercion. The same tactic, when used on a suspect who has invoked his rights, has been condemned,[10] either because it is seen as inherently coercive, *United States v.*

*Clark*, 499 F.2d 802 (4th Cir. 1974), or because it was held to have been intended by the police to induce a suspect to incriminate himself.[11] *Combs v. Wingo*, 465 F.2d 96 (6th Cir. 1972). *Innis* merely provides another analysis for arriving at the same result, by directing the inquiry toward police knowledge of the likelihood that confronting the accused with the evidence against him will evoke an incriminating response.

"To maintain a 'fair state individual balance', to require the government to 'shoulder the entire load', to respect the inviolability of the human personality, our accusatory system of criminal justice demands that the government seeking to punish an individual produce the evidence against him by its own independent labors, rather than by the cruel, simple expedient of compelling it from his own mouth." [Citations omitted.] *Miranda v. Arizona*, 384 U.S. at 460, 86 S.Ct. at 1620. Petitioner having shown that his confession was attained in violation of his constitutional privilege against self-incrimination, his petition for a writ of habeas corpus must be granted.

An appropriate order shall issue.

10. The Ninth Circuit has held *contra*. *See United States v. Pheaster*, 544 F.2d 353 (9th Cir. 1976); *United States v. Davis*, 527 F.2d 1110 (9th Cir. 1975).

11. In *Combs*, the accused invoked his right to counsel. The officer then read him an incriminating ballistics report. The suspect's subsequent confession was held to have been involuntary. The Sixth Circuit, quoting the dissenters in the state Supreme Court, stated:

The purpose of a question is to get an answer. Anything else that has the same purpose falls in the same category and is susceptible to the same abuses *Miranda* seeks to prevent. The only possible object of showing the ballistics report to the appellant in this case was to break him down and elicit a confession from him. The question was implied if not spoken. Everything was there but the question mark. It was a form of question and got the desired result.

465 F.2d at 99, *quoting Combs v. Commonwealth*, 438 S.W. 82, 86 (Ky.1969) Palmore, J. with Milliken, J., dissenting.